In the MATTER OF ATTORNEYS FEES IN: Grant E. STORMS, plaintiff, v. ACTION WISCONSIN INC. and Christopher Ott, defendants.

James R. DONOHOO, Appellant,†

v.

ACTION WISCONSIN, INC. and Christopher Ott, Respondents-Petitioners.

Supreme Court

*No. 2006AP396. Oral argument January 15, 2008.
—Decided June 5, 2008.*

2008 WI 56

(Also reported in 750 N.W.2d 739.)

† Motion for reconsideration dismissed July 30, 2008.

705

706

Roggensack, J., dissents.

PROSSER and ZIEGLER, JJ., join.

For the respondents-petitioners there were briefs by *Lester A. Pines, Tamara B. Packard,* and *Cullen Weston Pines & Bach LLP,* Madison, and oral argument by *Tamara B. Packard* and *Lester A. Pines.*

For the appellant there was a brief by *James R. Donohoo* and *James Donohoo Law Office,* Milwaukee, and oral argument by *James R. Donohoo.*

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Action Wisconsin, Inc., and Christopher Ott, seek review of an unpublished court of appeals decision reversing a circuit court judgment that required attorney James R. Donohoo to pay costs and attorney fees for filing and maintaining a defamation lawsuit that was frivolous.[1] The defamation lawsuit was commenced in response to a press release issued by Action Wisconsin.

¶ 2. Two statements in the press release formed the basis of the defamation lawsuit. One statement indicated that at an "International Conference on Homo-Fascism" a "speaker made sounds like gunfire as if he were shooting gay people . . . ." The other statement referenced the presence of a state senator at the conference and noted that the senate leadership would be appalled to find a colleague "in the audience for a speech apparently advocating the murder of his own constituents."

¶ 3. Action Wisconsin contends that the court of appeals should be reversed for two reasons: First, the

---

[1] *See Donohoo v. Action Wisconsin, Inc.,* No. 2006AP396, unpublished slip op. and order (Wis. Ct. App. May 30, 2007)(reversing judgment and order of the circuit court for Milwaukee County, Patricia D. McMahon, Judge).

court of appeals incorrectly concluded that the circuit court erred in determining that the lawsuit was frivolous. Second, the court of appeals committed error in sua sponte reviewing the circuit court's summary judgment decision on the merits of the case when that decision had not been appealed.

¶ 4. We conclude that the circuit court did not err in determining that the defamation suit was frivolously commenced and continued under Wis. Stat. §§ 802.05 and 814.025 (2003-04).[2] It determined that Donohoo had failed to conduct a reasonable inquiry before commencing the lawsuit and that there was no basis in fact or law that would support Donohoo's claim that Action Wisconsin's statements were made with actual malice. In this regard, we conclude that the court of appeals committed error when it reversed the circuit court's determinations.

¶ 5. However, we conclude that the court of appeals did not commit error in addressing the circuit court's summary judgment decision. The court of appeals did not sua sponte reverse a grant of summary

---

[2] All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.

Effective July 1, 2005, Wis. Stat. §§ 802.05 and 814.025 (2003-04) were repealed, and Wis. Stat. § (Rule) 802.05 (2005-06) was recreated. Supreme Court Order 03-06, 2005 WI 38, 278 Wis. 2d xiii. The new rule is procedural and there is a presumption that it applies retroactively, including to motions for frivolousness where the conduct that is the subject of such a motion occurs before the effective date of the new rule, but where the motion is filed after the effective date of the new rule. *Trinity Petroleum, Inc. v. Scott Oil Co.*, 2007 WI 88, ¶ 52, 302 Wis. 2d 299, 735 N.W.2d 1. The parties agree that this case is controlled by §§ 802.05 and 814.025 (2003-04). Action Wisconsin's motion for costs and attorney fees based on frivolousness was filed before the effective date of § (Rule) 802.05 (2005-06).

judgment that was never appealed. Rather, it addressed the summary judgment decision only to the extent that it was necessary to address the substantive issues of the case in order to review the circuit court's determinations of frivolousness.

¶ 6. Accordingly, because we conclude the circuit court did not err in determining that the defamation suit was commenced and continued frivolously, we reverse the court of appeals.

I

¶ 7. The basic facts of this case are not complex and not in dispute. They are essentially set forth in the audio recording and transcript of a speech of the plaintiff, Grant E. Storms, and in the press release of Action Wisconsin describing the speech.

¶ 8. Storms is the pastor of a church in Louisiana. He hosts a talk show on a New Orleans radio station, and he has appeared on radio shows hosted by others in Louisiana, on a nationally broadcast radio show, and on Internet radio shows. Storms considers himself a Christian activist, and he has engaged in protest activities "against the homosexual agenda."

¶ 9. In October 2003, Wisconsin Christians United hosted a conference in Milwaukee titled "International Conference on Homo-Fascism." Storms was invited to speak at the conference. During his speech, Storms described his efforts to curb the "homosexual movement," and admonished his audience to take an active role in such an effort.

¶ 10. During the speech Storms drew an analogy between the homosexual movement and the Philistine army in the story of Jonathan and his armor bearer. Storms described Jonathan, an Israelite, leaving his

army's encampment without permission from Saul, the leader of the Israelites, and confronting the Philistines with his armor bearer.

¶ 11. Several passages from Storms' speech are of particular importance here. He warned his audience of the strength of the homosexual movement, in part based on its unity.

> There's an uncanny unity in solidarity amongst the homosexuals. . . . They're solidified. They're single minded. Don't underestimate them.

He further warned of the movement's contempt and hatred.

> They are a scornful people. They hate us. They have contempt for us. . . . We need to understand that. Don't think you're going to tiptoe out there and say hey, repent. They will want to kill you.

¶ 12. In describing the conflict between his movement and the homosexual movement, Storms indicated that one side or the other must prevail, and that coexistence was not possible:

> They are a stubborn people and they don't care. They want to trample us. . . . Here it is. It's us or them. There's no in between. There's no having this peaceful co-existence. They have to eliminate us and the Word of God if they want to succeed. It's almost like communism and capitalism. It's going to be one or the other. You can't have both. You can't peacefully co-exist.

Storms stated that the alternative to succeeding was being crushed, silenced, killed, or imprisoned.

> Either we're going to succeed or they're going to succeed. Whether it's going to be a homosexual, anti-God nation, or it's going to be a nation that stands for God and says that that thing is sin. It can't be both. Won't be

711

both. Something's going to happen. Either they'll crush us and have laws and silence us and kill the ones that won't be silenced or imprison the ones that won't be silent, or the church or the Lord Jesus Christ will rise up and say this is a Christian nation. This is the way it will remain. Go back in the closet.

¶ 13. In drawing the analogy between the story of Jonathan and his armor bearer and the subject matter of the conference, Storms described the homosexual movement as a Philistine army that wants to eliminate those like Storms and his audience. He compared contemporary Christians to the Israelites resting under a pomegranate tree, rather than battling the Philistine army.

There is a Philistine Army out there, it's called the homosexual movement. Whether you can see it or not, understand it or not, they want to eliminate us. This is no time to be under a pomegranate tree. . . . They [the Israelites] were a bunch of Tiny Tims tiptoeing through the tulips. And that is the church today unfortunately. When we're supposed to be out to battle, when we're supposed to be battling the enemy, we're under some stinking pomegranate tree shaking in our boots. That's where the church is. The church is hiding. The Christians are hiding.

Storms told his audience that he no longer listens to such Christians: "I just don't listen to Christians anymore. They will try to talk you out of going and beating up the Philistine Army on your own."

¶ 14. Storms lamented the lack of progress for his cause in legislatures and in courts. He indicated that for 20 years efforts have been made to influence bad legislators and convince wicked judges, but that now it was time to begin "taking it to the streets."

You know I'm sick of appealing all this stuff. Why do good people have to go to these stinking wicked judges

and beg them to please do the right thing. No forget the appeals. Forget the petition. We've been petitioning for 20 years. Signing petitions for 20 years, making phone calls for 20 years. We've been begging bad legislators and bad judges to try to do the good thing. Enough is enough. My friend. Just start taking it to the streets.

¶ 15. In telling the story of Jonathan and the armor bearer, Storms related the part of the story in which Jonathan kills the Philistines. Storms then shouted "Let's go through the drive-thru at McDonald's" and "get the rest."

Wheeew! Come on. Let's go. God has delivered them all into our hands. Hallelujah! Boom, boom, boom, boom, boom. There's twenty. Whew. Ca-Ching. Yes. Glory. Glory to God. Let's go through the drive-thru at McDonald's and come back and get the rest.

¶ 16. Action Wisconsin responded to the speech. It describes itself as an organization dedicated to advancing and protecting the civil rights of lesbian, gay, bisexual and transgender people. At all times relevant to this case, Christopher Ott was the executive director of Action Wisconsin and Timothy O'Brien was president of the Action Wisconsin board of directors. As executive director, Ott reported directly to O'Brien, and as president, O'Brien was an authorized spokesperson for Action Wisconsin.

¶ 17. Action Wisconsin learned that a state senator had attended the conference and Storms' speech. Because the senator's attendance concerned O'Brien, he obtained audio recordings of the conference speakers, which were available for sale on the Wisconsin Christians United website.[3]

---

[3] In fall and winter of 2003, Action Wisconsin publicly opposed state legislation and an amendment to the state

¶ 18. O'Brien listened to all of the speeches from the conference, and he listened to Storms' speech in its entirety. In an affidavit, O'Brien stated that he was shocked by the violent imagery and "derogatory and false statements about gay and lesbian people and the gay and lesbian community" in Storms' speech. He explained that he was disturbed in particular by "Storms' claims that gay and lesbian people wanted to kill members of Storms' audience, and what I understood to be corresponding suggestions that members of his audience kill gay and lesbian people." O'Brien thought it "obvious that [Storms] was drawing a parallel between the Philistines who were slain, literally, by the Israelites, and gay and lesbian people, who, completing the analogy, should be literally killed . . . ."

¶ 19. At O'Brien's request, Ott and Joshua Freker, another member of Action Wisconsin's staff, listened to portions of the speeches from the conference. They agreed with O'Brien's interpretation of Storms' speech.

¶ 20. Action Wisconsin issued a press release in response to the speech. Two statements from the press release are the subject of this lawsuit. First, referring to Storms, the press release stated that a "speaker made sounds like gunfire as if he were shooting gay people, saying, 'God has delivered them into our hands . . . Boom boom boom . . . there's twenty! Ca-ching! Glory, glory to God.' " Second, in reference to the state senator in attendance, the press release stated that "[w]e trust

constitution explicitly reserving marriage for opposite-gender couples and prohibiting the recognition of marriages not composed of an opposite-gender couple. *See* Wis. Const. art. XIII, § 13 ("Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.")

that Senator Panzer will be as appalled as we were to find one of her colleagues in the audience for a speech apparently advocating the murder of his own constituents." It then quoted several passages from Storms' and others' conference speeches.

¶ 21. Attorney Donohoo, acting on Storms' behalf, sent a letter to O'Brien stating that the two statements in the press release were false and defamatory. The letter requested that Action Wisconsin retract the statements and remove the press release from its website. When Action Wisconsin did not respond, Donohoo sent a second letter stating that Storms had authorized him to file a complaint for defamation.

¶ 22. Receiving no response to the second letter, Donohoo filed such a complaint on behalf of Storms against Action Wisconsin and Ott. Prior to filing the suit, Donohoo listened to and analyzed Storms' speech. He concluded that "no person listening to the speech could have reasonably interpreted [the] speech to mean that [Storms] was re-enacting the shooting of gay people, or that [Storms] was advocating the murder of gay people." Sometime after filing suit, Donohoo had two of his law clerks and two other people review the speech. These people told Donohoo that they did not believe someone listening to the speech could conclude that Storms was advocating the murder of gay people.

¶ 23. Action Wisconsin answered the complaint and filed a motion for costs and attorney fees pursuant to Wis. Stat. §§ 802.05 and 814.025. At the same time, counsel for Action Wisconsin sent a letter to Donohoo outlining why it thought the lawsuit was frivolous. The letter set forth the legal standards for frivolousness and defamation. It explained that Storms would have to show actual malice and advised that there was no reasonable basis in law or fact to support such a claim.

715

Additionally, the letter indicated that it appeared that Donohoo failed to engage in a reasonable inquiry before filing the lawsuit.

¶ 24. Action Wisconsin took Storms' deposition. Shortly after, its counsel again wrote to Donohoo outlining why it thought the lawsuit was frivolous. He urged Donohoo to dismiss the case and in exchange "we will not seek sanctions for this frivolous lawsuit." Beyond the reasons offered in Action Wisconsin's first letter, the second letter set forth in detail the parts of the speech that supported its interpretation.

¶ 25. Donohoo did not answer either of the letters. Counsel for Action Wisconsin filed a motion for summary judgment, after which Donohoo conducted discovery. Donohoo then filed a motion for summary judgment on Storms' behalf. The circuit court determined that Storms had failed to show that Action Wisconsin's statements were false, stating that Action Wisconsin's interpretation of the speech was "not unreasonable" and that Storms' interpretation was "strained and inconsistent with the speech as a whole." It further determined that Storms had failed to present evidence that Action Wisconsin had acted with actual malice.

¶ 26. Accordingly, the circuit court granted Action Wisconsin's motion for summary judgment, denied Storms' motion for summary judgment, and dismissed the case. That decision was never appealed.

¶ 27. After the summary judgment decision, Donohoo filed a motion for reconsideration of the summary judgment decision on behalf of Storms. Action Wisconsin submitted supporting materials for its motion for costs and fees, asserting that the lawsuit was frivolous. The circuit court denied the motion for reconsideration, stating that the motion "essentially rear-

gues the motions for summary judgment" and "misstates the decision" of the court.

¶ 28. The court granted Action Wisconsin's motion for costs and attorney fees pursuant to §§ 802.05 and 814.025. It determined that prior to the filing of the lawsuit, Donohoo knew or should have known that neither the facts nor the law supported the claim of actual malice, which would have to be shown by clear and convincing evidence. It concluded that Donohoo had failed to conduct a reasonable inquiry into the claim before filing the lawsuit.

¶ 29. In addition, the circuit court stated that Donohoo continued the lawsuit even though he knew or should have known that the claim was brought "without any reasonable basis in law or equity." The court explained that Action Wisconsin had put Donohoo on notice that there was no support for the assertion that Action Wisconsin acted with actual malice. However, Donohoo ignored the warnings, and failed to explain how he proposed to show actual malice. The court determined that the failure to conduct an adequate investigation and the failure to respond to Action Wisconsin's letters detailing the law forced Action Wisconsin "to expend considerable resources in defense." The circuit court concluded that Donohoo "merely dropped his paper 'into the hopper' of the legal system and required this Court and defendants to undertake the necessary factual and legal investigation."

¶ 30. Donohoo appealed. The majority of the court of appeals determined that Donohoo engaged in a reasonable inquiry into the facts and the law and that there were disputed issues of material fact regarding whether there was actual malice. *Donohoo v. Action Wisconsin, Inc.*, No. 2006AP396, unpublished slip op. and order, ¶¶ 31–32 (Wis. Ct. App. May 30, 2007). It

717

therefore concluded that the circuit court erred in determining that Donohoo commenced and continued a frivolous action under §§ 802.05 and 814.025 and reversed.[4] *Id.*, ¶ 33. Action Wisconsin petitioned for review.

## II

¶ 31. In this case we address a circuit court's determinations that an attorney commenced and continued a frivolous action under Wis. Stat. §§ 802.05 and 814.025. Under section 802.05(1)(a), an attorney's signature on a pleading, motion or other paper certifies the attorney's belief, "formed after reasonable inquiry, the pleading, motion or other paper is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law."[5]

---

[4] Donohoo's notice of appeal indicated that he was appealing both the order awarding costs and attorney fees to Action Wisconsin and the order denying the motion for reconsideration. The mandate line of the court of appeals opinion states simply "[j]udgment and order reversed." However, the text of the court of appeals opinion explains that the case "is not about whether the trial court correctly decided the summary judgment issue," slip op., ¶ 9, and explicitly reverses only the order granting Action Wisconsin's motion seeking attorney fees, slip op., ¶ 33. Further, Donohoo concedes that there was no appeal of the summary judgment determination and that the issue before this court is limited to frivolousness. Thus, we do not address the order denying the motion for reconsideration except insofar as it is relevant to the issue of frivolousness.

[5] Wisconsin Stat. § 802.05 provides in relevant part:

Every pleading, motion or other paper of a party represented by an attorney shall contain the name . . . of the attorney . . . and

¶ 32. Section 814.025(3)(b) provides that a circuit court may determine that an attorney commences or continues a frivolous action if the attorney "knew, or should have known, that the action . . . was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law."[6]

shall be subscribed with the handwritten signature of at least one attorney of record in the individual's name. . . . The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading, motion or other paper; that to the best of the attorney's or party's knowledge, information and belief, formed after reasonable inquiry, the pleading, motion or other paper is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that the pleading, motion or other paper is not used for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If the court determines that an attorney or party failed to read or make the determinations required under this subsection before signing any petition, motion or other paper, the court may, upon motion or upon its own initiative, impose an appropriate sanction on the person who signed the pleading, motion or other paper, or on a represented party, or on both. The sanction may include an order to pay to the other party the amount of reasonable expenses incurred by that party because of the filing of the pleading, motion or other paper, including reasonable attorney fees.

[6] Wisconsin Stat. § 814.025 provides in relevant part:

Costs upon frivolous claims and counterclaims.

(1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

. . . .

(3) In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:

719

¶ 33. This court has articulated two standards of review for circuit court determinations of frivolousness, one regarding commencing frivolous actions and one regarding continuing frivolous actions.

■

¶ 34. This court has determined that "[w]hen made pursuant to Wis. Stat. § 802.05, our review of a circuit court's decision that an action was commenced frivolously is deferential." *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 548, 597 N.W.2d 744 (1999). According to this deferential standard, the nature and extent of investigation undertaken prior to filing a suit are issues of fact, and a circuit court's determinations on such questions will be upheld unless clearly erroneous. *Id.* The determination of how much investigation should have been done is a question that is within the circuit court's discretion. *Id.* A discretionary decision by the circuit court will be sustained where the court "examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Id.* at 549 (citing *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982)).

■

¶ 35. We have explained that reviewing a circuit court's determination under § 814.025 that an action was continued frivolously involves a mixed question of law and fact. *Id.* at 562. We stated that what an indi-

. . . .

(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

vidual or attorney knew or should have known is a question of fact that will be sustained unless clearly erroneous. *Id.* at 563. Whether the circuit court's determinations of fact support a conclusion that a lawsuit was continued frivolously, however, is a question of law that this court reviews independently of the determinations rendered by the circuit court or court of appeals. *Id.*[7]

### III

¶ 36. This case is about a circuit court's determinations that a lawsuit was frivolously commenced and continued. In essence, it is about actual malice—whether the circuit court erroneously exercised its discretion in determining that there was no basis in fact or law that would support Donohoo's claim that Action Wisconsin's statements were made with actual malice.

¶ 37. Because the underlying question concerns the defamation lawsuit filed by Donohoo on behalf of Storms we turn initially to an examination of defamation law. In a common law defamation cause of action that does not involve a public figure, there are only three elements:

(1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person

---

[7] We note that the repeal of §§ 802.05 and 814.025 (2003–04) and recreation § (Rule) 802.05 (2005–06) may call into question the existence of different standards of review for commencing and continuing frivolous claims. This is particularly so insofar as § (Rule) 802.05 is patterned after federal rule of civil procedure 11. *See Trinity Petroleum, Inc. v. Scott Oil, Co.,* 2007 WI 88, ¶ 49, 302 Wis. 2d 299, 735 N.W.2d 1. Federal courts review the imposition of sanctions under Rule 11 for erroneous exercise of discretion. *Mars Steel Corp. v. Cont'l Bank N.A.,* 880 F.2d 928, 933 (7th Cir. 1989).

defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Torgerson v. Journal/Sentinel. Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997); *see* Wis JI—Civil 2500.[8]

■

¶ 38. This defamation lawsuit, however, involves a public figure. The United States Supreme Court has determined that the First and Fourteenth Amendments to the federal constitution require that defamation plaintiffs who are public figures must also prove by clear and convincing evidence another element, actual malice. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Actual malice does not involve bad intent or ill-will, and therefore differs from the vernacular understanding of malice. *Torgerson*, 210 Wis. 2d at 536. Rather, actual malice requires that the

---

[8] The court of appeals in the present case listed four elements, following other court of appeals decisions and the Restatement (Second) of Torts § 558 (1981): (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Slip op., ¶ 15; slip op., ¶ 40 (Curley, J., dissenting); *see Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 912, 447 N.W.2d 105 (Ct. App. 1989).

As this court noted in *Torgerson v. Journal/Sentinel, Inc.*, if the two sets of elements are at all different, such distinctions are not important in the present case. 210 Wis. 2d 524, 535 n. 9, 563 N.W.2d 472 (1997).

allegedly defamatory statement be made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan,* 376 U.S. at 280.

¶ 39. Reckless disregard for the truth is not measured by what the reasonably prudent person would publish or investigate prior to publishing. Instead it is a subjective standard. *Torgerson,* 210 Wis. 2d at 542. It requires showing that the false statement was made "with a high degree of awareness of . . . probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964), or that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968).

¶ 40. The Supreme Court has recognized that such a demanding standard "may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher." *Id.* However, it has emphasized that the importance of open debate regarding public affairs and the conduct of public figures is so great that "neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *Id.* at 732.

¶ 41. The parties agree that Storms is a public figure, and that to succeed in a defamation suit he would have to show actual malice. The dispute here is focused on the element of actual malice.[9]

---

[9] The dissent focuses much of its attention on another element of a defamation claim, namely, whether Action Wisconsin's statements have defamatory meaning, such that they tend to "diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse,

723

A

¶ 42. The circuit court determined that prior to commencing the lawsuit Donohoo knew or should have known that a cause of action for defamation would require showing actual malice by clear and convincing evidence and that Donohoo knew or should have known that the law did not support such a claim. It further determined that in light of the straightforward facts of the case and the law of defamation, Donohoo failed to conduct a reasonable inquiry into the claim prior to filing.

¶ 43. Donohoo argues that the circuit court erred in its determination that the law did not support the claim that Action Wisconsin acted with actual malice. The cornerstone of his argument is based on his review of the speech prior to commencing the lawsuit and his conclusion that no one "could have reasonably interpreted it to have advocated the murder of gay people." When the entire speech is examined, he contends, it is "inconceivable" that Action Wisconsin believed that Storms advocated murdering gay people or that he made sounds as if shooting gay people. Donohoo maintains that because it is inconceivable Action Wisconsin believed that Storms advocated murdering gay people,

derogatory or unpleasant feelings or opinions against him." Dissent, ¶ 116 (quoting *Starobin v. Northridge Lakes Dev. Co.,* 94 Wis. 2d 1, 10, 287 N.W.2d 747). It points out that Donohoo, the court of appeals, and three members of this court have determined that the statement is defamatory.

The parties, however, neither dispute nor examine whether the statements are capable of defamatory meaning because it is irrelevant to the issue at hand. The only element that is at issue here is actual malice. The dissent's discussion appears to obfuscate the real issue.

it must have had serious doubts about the truth of the statements in the press release.

¶ 44. He asserts that Action Wisconsin's interpretation of Storms' speech as advocating the murder of gay people is the result of selecting sentences from the speech and cobbling them together to support its conclusion. Donohoo adduces altogether different passages from the speech in support of another interpretation. He maintains that the following aspects of the speech demonstrate that Action Wisconsin's interpretation is unreasonable and thus serve as a basis for proving actual malice:

- The theme of Storms' speech was that "[y]ou alone, with God's help, can make a difference, no matter what the odds."

- The discussion of "taking it to the streets" was meant to contrast with efforts such as petitions, phone calls, and "begging" legislators and judges. "Taking it to the streets" refers to things like Storms' own efforts to make a difference by videotaping Southern Decadence, sending the video to public officials, sharing the Gospel with homosexuals, and staging protests.

- Tempering Storms' "tak[e] it to the streets" message were admonitions to not be "spiritually reckless" and to do what was in their hearts if it was not sin.

- Storms drew a parallel between the Philistines and the homosexual movement in terms of their characteristics—"solidarity, scornfulness, and stubbornness."

- The term that Storms used throughout the speech was the "homosexual movement," and the homosexual movement was the analogue to the Philistine army, not individual homosexuals.

- When Storms made his "boom, boom, boom" sounds, they were not meant to sound like explosions or gunfire, but were made to enliven the passage and "capture the imagination of the listeners." Similarly, the reference to the drive-through at McDonald's merely illustrated Jonathan and his armor bearer taking a break while God worked.

These aspects of the speech, Donohoo argues, demonstrate that Action Wisconsin's interpretation is "inconceivable" and that the only reasonable interpretation is that Storms did not advocate the murder of homosexuals.

■

¶ 45. There is no dispute about what words were spoken at Storms' speech. Rather, the dispute concerns whether Action Wisconsin's interpretation of the speech is a reasonable interpretation of ambiguous statements. If it is, then Donohoo as a matter of law cannot meet his burden of showing actual malice. In essence, Donohoo argues that if his is the only reasonable interpretation of the speech, then there is a basis for the actual malice claim. Thus, Donohoo is arguing that a factual inference can be made about whether Action Wisconsin entertained serious doubts as to the truth of their statements on the ground that Action Wisconsin's interpretation is unreasonable.

¶ 46. However, as Donohoo recognized during oral argument the determination of whether there is a single reasonable interpretation of the speech or whether the speech is ambiguous is a question of law. In *Torgerson,* for example, this court determined that the defendant newspaper was entitled to summary judgment in a defamation case because letters from the state Ethics Board were ambiguous. The court determined that the defendant's characterization of the

letters was "a rational interpretation of ambiguous statements contained in those letters." 210 Wis. 2d at 546. It concluded that the deliberate choice of that interpretation over another interpretation could not constitute evidence of actual malice, even if the interpretation was provably false. *Id.* at 545.

¶ 47. While we do not doubt that Donohoo's is a reasonable interpretation, we cannot agree that it is the only reasonable interpretation. His choice of passages from the speech is no less selective than Action Wisconsin's. He has simply emphasized different passages, namely, those that do not have violent imagery.

¶ 48. Donohoo fails to address many of the passages emphasized by Action Wisconsin to illustrate the violent tone of the speech. Storms warned his listeners that "[t]hey'll want to kill you," "they don't care," "they want to trample us," "[i]t's us or them," "[t]hey have to eliminate us," and "[t]here's no having this peaceful co-existence." He described how "they" have violent, oppressive, and murderous potential: "they'll crush us and have laws and silence us and kill the ones that won't be silent. . . . " He expressly warned against listening to those that "will try to talk you out of going and beating up the Philistine army on your own." When Storms' exclamation of "boom, boom, boom, boom, boom" is considered in light of such violent descriptions, Action Wisconsin's interpretation is reasonable.

¶ 49. In addition to being selective, the facets of the speech Donohoo emphasizes do not show that Action Wisconsin's interpretation is unreasonable. Therefore they fail to provide a basis for the claim of actual malice, that is, that Action Wisconsin made a statement with "knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan,* 376 U.S. at 279–80. We consider them in turn.

¶ 50. Regarding his first assertion, Donohoo is correct that the theme of Storms' speech was that "you alone, with God's help, can make a difference, no matter what the odds." That, however, says nothing about what sorts of things one might do to make a difference, despite long odds.

¶ 51. The next aspect of the speech Donohoo adduces is that Storms' examples of "taking it to the streets" include videotaping, sharing the gospel, and staging a protest. However, Storms is explicit that taking it to the streets is not limited to such activities. He states:

> Give me a bombshell, give me a bomb oh God. Give me something Lord that's going to shake the city, and shake the state, and shake this nation. . . .

> Do what's in your heart. He's with you. Some of you right now. You have these wild, crazy things you won't even tell anybody about. You have this plan and you can't get away from it. The Lord put that there. The Lord put it there. Go do it.

The speech is open to many interpretations of what these "bombs" and "wild, crazy things" could include.

¶ 52. Donohoo's assertion that Storms admonished listeners not to be spiritually reckless and not to sin is also unpersuasive and also fails to show that Action Wisconsin's interpretation is unreasonable. It is unclear what Storms meant by the admonition. In one passage he states: "Listen to your heart. Whatever is in your heart. Do it. He's with you. It's not sin. That's the way I look at it. And the wilder the better in my opinion."

¶ 53. The next claim Donohoo makes is that Storms drew parallels between the Philistine army and the homosexual movement on the basis of shared characteristics. However, Donohoo has failed to offer any explanation for why basing the comparison on such characteristics shows that Storms did not advocate

treating the homosexual movement like Jonathan treated the Philistine army.

¶ 54. Donohoo claims also that Storms carefully referred to the "homosexual movement" rather than individual homosexuals. This, too, fails to show that Action Wisconsin's interpretation is unreasonable. Donohoo is incorrect that Storms refers only to the "homosexual movement." Our review of the speech indicates that Storms does refer to "homosexuals." For example, in describing the strength of Storms' opponent, he warns of the "uncanny unity and solidarity amongst the homosexuals." Similarly, in encouraging his audience to act on their frustrations he states that "if you're frustrated about seeing the homosexuals taking over our nation, that's a good thing."

¶ 55. Lastly, it is plausible that when Storms made the "boom, boom, boom, boom, boom" sounds he did not intend it to sound like gun shots, and it is plausible that his remarks about the McDonald's drive-through were intended to be about Jonathan taking a rest. However, that is not the only reasonable interpretation. It is also reasonable to conclude that Storms intended his listeners to imagine the story in a modern setting, with modern weapons (guns), modern rest facilities (McDonald's), and a modern opponent (the homosexual movement).

¶ 56. Thus, while Donohoo has proffered a reasonable alternative interpretation, he has not demonstrated that Action Wisconsin's interpretation is unreasonable. Rather, he has simply emphasized different passages. Both Donohoo's interpretation and Action Wisconsin's interpretation are reasonable. That is, the speech is ambiguous.[10]

---

[10] To assist the reader, a copy of the transcript of Storms' speech is attached as an appendix to this opinion. The tran-

¶ 57. Because the speech is ambiguous, the reasonable alternative interpretation of Storms' speech that Donohoo provides does not permit an inference of actual malice. Action Wisconsin's statements were based on one of at least two rational interpretations. There is ample case law for the proposition that actual malice cannot be inferred from the choice of one rational interpretation over another.[11]

¶ 58. *Time, Inc. v. Pape* involved an article describing incidents of police brutality. 401 U.S. 279, 281–82 (1971). The article was based upon a government report, and quoted the summary of a civil complaint contained in the report. However, it removed the word "alleged" from the summary of the complaint, and did not explain that the quote came from an unproven complaint. *Id.* at 282.

---

script and a compact disk recording of the speech were attached by Attorney Donohoo to Storms' brief in opposition to Action Wisconsin's motion for summary judgment.

[11] The dissent asserts that whether Action Wisconsin's statements were false "remains a fact question for the jury," and that a reasonable jury could determine that the statements were false. Dissent, ¶ 114. A reasonable jury could therefore also determine that the statements were true according to the dissent's view.

However, Attorney Donohoo's primary argument is that the statements were so obviously false that Action Wisconsin must have acted with actual malice. His contention appears to be at odds with the dissent's view. The dissent's assertion implicitly acknowledges that a reasonable attorney, and hence Attorney Donohoo, should have known that he could not prove actual malice, and thus that the suit was frivolous. How could he show that Action Wisconsin knew the statements were false or acted in reckless disregard of the truth if the underlying premise—the falsity—is so uncertain that it presents a question of fact for the jury?

¶ 59. The Supreme Court determined the omission of the word "alleged" was in essence adopting "one of a number of possible rational interpretations of a document that bristled with ambiguities." *Id.* at 290. The Court concluded that such a choice did not demonstrate actual malice, even though it may have reflected a misconception. *Id.* In *Masson v. New Yorker Magazine,* the Supreme Court explained that the "protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources." 501 U.S. 496, 519 (1991).

¶ 60. This court addressed the issue of choosing between rational interpretations in *Torgerson.* That case involved a newspaper article stating that the plaintiff, who served in the Office of Commissioner of Insurance and had an interest in a title insurance agency, had ignored letters by the state Ethics Board as "warnings" to "stay out" of title insurance matters. 210 Wis. 2d at 545. Prior articles by the same journalist had described the same letters as "guidelines and limitations" that would "limit" contact with such matters. *Id.* at 544–45. Citing *Time, Inc. v. Pape* and *Masson,* this court determined that the letters were ambiguous, and that the deliberate choice between different interpretations did not show actual malice.

¶ 61. The same reasoning applies in the present case. Storms' speech is ambiguous, and Action Wisconsin has chosen one rational interpretation. As a matter of law, that choice does not demonstrate actual malice. Thus, Donohoo's assertion that Action Wisconsin's interpretation demonstrates actual malice is incorrect.

¶ 62. In addition to his argument that Action Wisconsin's interpretation is unreasonable, Donohoo

cites the following as factual evidence of actual malice prior to his filing the complaint:

- Storms did not explicitly state that he advocated murdering gay people.

- Action Wisconsin did not attempt to contact Storms before issuing its press release, and it did not respond to the requests for retraction.

- The language in the press release is of a "serious nature" and showed ill-will toward Storms.

- The press release appeared calculated to advance Action Wisconsin's political agenda.

¶ 63. These facts are not in dispute. However, they fail to demonstrate a reasonable factual or legal basis for actual malice, and Donohoo makes no argument based in equity. The fact that there is no language in the speech explicitly stating that members of the audience ought to murder homosexuals says nothing about whether Action Wisconsin was reckless in its interpretation of the speech.

¶ 64. Further, Donohoo has offered no explanation and proffered no case law showing why the facts that Action Wisconsin did not attempt to contact Storms before issuing its press release and did not respond to retraction requests are evidence of actual malice.

¶ 65. Donohoo's position is also contrary to this court's decision in *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 447 N.W.2d 105 (1989). In that case we determined that the repeated publication of a statement after being informed that the statement was false did not constitute actual malice so long as the speaker believed it to be true. *Id.* at 917–18.

¶ 66. Donohoo is correct that the statements in the press release are of a serious nature. However, even assuming that Donohoo is correct that Action Wisconsin's press release evinces ill-will toward Storms, he fails to explain how such ill-will shows actual malice. Courts have made clear that actual malice does not mean bad intent, ill-will, or animus. *Masson,* 501 U.S. at 510–11; *Torgerson,* 210 Wis. 2d at 536.

¶ 67. He maintains that such ill-will could provide motivation for Action Wisconsin to "twist" Storms' speech. Placing a greater burden on ideological opponents, however, is contrary to the principles that underwrite the actual malice standard in the first instance. Donohoo's argument is also contrary to the Seventh Circuit's determination that "facial expression, content of speech and body language" that demonstrated a strongly negative disposition to the subject of a statement did not support a claim of actual malice. *Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir. 1994).

¶ 68. Donohoo's assertion that actual malice is evinced by the fact that the press release appeared calculated to further Action Wisconsin's political agenda is similarly unpersuasive. The seminal defamation case, *New York Times v. Sullivan,* involved political speech. 376 U.S. 254. To maintain that where a statement furthers one's political views there is evidence of actual malice would undermine the very protections that justify the actual malice requirement in the first instance.[12]

---

[12] The dissent maintains that a reasonable attorney could believe that Action Wisconsin's statements were made with actual malice "because the statement was part of Action Wisconsin's attempt to promote one side of a highly charged political issue." Dissent, ¶ 122. The effect of the dissent's view is to make it easier to find actual malice in cases of speech

733

¶ 69. Having set forth the above facts and law, we turn to the circuit court's decision that Donohoo commenced this action frivolously. The amount of investigation that Donohoo should have done prior to filing is a determination that is within the circuit court's discretion. *Jandrt,* 227 Wis. 2d at 548. We will uphold this determination unless it is clearly erroneous. *Id.*

¶ 70. The circuit court examined the relevant facts of the case, and it determined that they were not complex. It also examined the law on defamation and determined that the legal issues involved in the lawsuit were not complex. Further, the court reasoned that Donohoo had sufficient time to research the relevant law. It explained that while Donohoo's interpretation of the speech was reasonable, it was less reasonable than Action Wisconsin's. The court determined that the filings Donohoo made on behalf of Storms did not present a plausible view of the law or an argument to extend or modify the law.

¶ 71. The court examined the relevant facts, applied the proper standards of law, and using a demonstrated rational process reached a conclusion that a reasonable judge could make. In light of the time and lack of complexity of the issues, the court determined that Donohoo had failed to conduct a reasonable inquiry prior to filing the suit. This determination is not clearly erroneous. Additionally, consistent with legal authority, the circuit court concluded that there was no basis in fact or law that would support a claim that Action Wisconsin's statements were made with actual

regarding contentious political issues. Such issues, however, are where First Amendment protections are at their apex. *Buckley v. Valeo,* 424 U.S. 1, 14 (1976).

malice. Accordingly, we conclude that the circuit court's determination was not an erroneous exercise of its discretion.

## B

¶ 72. In addition to its determination that Donohoo commenced the lawsuit frivolously, the circuit court determined that Donohoo continued the lawsuit even though he knew or should have known that the claim was brought "without any reasonable basis in law or equity." Wis. Stat. § 814.205(3)(b). The determination of what an attorney knew or should have known "is a factual question, and the circuit court's findings of fact will not be reversed by an appellate court unless the findings are clearly erroneous. *Jandrt,* 227 Wis. 2d at 563. Here, the court explained that Action Wisconsin's letters to Donohoo put him on notice that there was no support for the element of actual malice, but that Donohoo ignored the warnings and failed to explain how he proposed to show actual malice.

¶ 73. Donohoo maintains that the circuit court erred in its determination for several reasons. First, he asserts that Action Wisconsin's interpretation is unreasonable. For the reasons outlined in the previous section, this argument is unpersuasive.

¶ 74. In addition, Donohoo argues that the following undisputed facts show that Action Wisconsin acted with actual malice:

- Two members of Action Wisconsin did not listen to the entire speech before issuing the press release.
- Action Wisconsin did not consider contacting law enforcement upon hearing Storms' speech.

Donohoo fails to provide a legal basis for these arguments.

735

¶ 75. There is no dispute that Ott and Freker did not listen to Storms' speech in its entirety before the press release was issued. The court of appeals relied on *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967) to support the view that such failure evinces actual malice.

¶ 76. *Butts* involved a libel action against a magazine for publishing allegations that a college football coach was involved in game-fixing. *Id.* at 135. The sole source of the story was a person known by the publisher to be on probation for writing bad checks, none of the magazine personnel reviewed the source's notes, another person who was with the source when the source heard the story was not consulted, and there was no attempt by any in the organization to screen the films of allegedly fixed games. *Id.* at 157. The court determined that such evidence could support a determination of actual malice.

¶ 77. The current case bears no resemblance to *Butts.* Here, the president of Action Wisconsin's board of directors, O'Brien, listened to the entire speech and was disturbed by what he heard. He then consulted with Ott and Freker, and they confirmed that speech contained the statements that O'Brien described. Together they decided on the response. This is entirely unlike the situation in *Butts,* where no one made any effort to confirm the claims of a known unreliable source.

¶ 78. Even if there was a failure of Action Wisconsin to investigate prior to issuing its press release, "mere proof of failure to investigate the accuracy of a statement, without more, cannot establish the reckless disregard for the truth necessary for proving actual malice." *Erdmann v. SF Broad. Of Green Bay, Inc.,* 229 Wis. 2d 156, 170, 599 N.W.2d 1 (Ct. App. 1999)(citing

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 332 (1974)). For the reasons provided in the previous section, the other arguments Donohoo adduces fail to provide the something more required to establish actual malice.

¶ 79. Donohoo's argument that Ott and Freker did not think about contacting police regarding Storms' speech, illustrating that "they did not honestly believe that Storms had advocated the murder of gays in his speech," is similarly unpersuasive. Research into the relevant law would have dissuaded Donohoo from this argument.

¶ 80. *Brandenberg v. Ohio* involved a conviction under a statute prohibiting advocacy of violent political reform for a speech which included the language "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken." 395 U.S. 444, 446 (1969). The Supreme Court determined that the First Amendment protects the advocacy of violence that falls short of incitement to imminent lawless action. *Id.* at 447. Action Wisconsin has not claimed that Storms' speech incited imminent lawless action.

¶ 81. Accordingly, we determine that the circuit court did not err in concluding that Donohoo continued the lawsuit frivolously. The circuit court explained that Action Wisconsin's letters put Donohoo on notice regarding frivolousness. Further, the facts adduced by Donohoo as evidence of actual malice are not supported by the law, and Donohoo makes no argument based in equity. Thus, the circuit court's factual determination that Donohoo knew or should have known that the lawsuit had no basis in law or equity is not clearly erroneous. Under § 814.025, this factual determination

737

supports the circuit court's conclusion that Donohoo continued the lawsuit frivolously.

## IV

¶ 82. Action Wisconsin also argues that the court of appeals erred in reviewing, sua sponte, the circuit court's summary judgment decision on the merits of the case when that decision had not been appealed. It argues that there were no issues of disputed fact with respect to the defamation claim, and that the questions on appeal concerned legal conclusions based upon undisputed facts.

¶ 83. To address this issue requires that we examine three questions. The first concerns whether the court of appeals erred in addressing the substantive issues of the case. Those issues were decided by the circuit court on summary judgment, but were not before the court of appeals insofar as summary judgment was not appealed. This court has addressed the question before. *Jandrt* involved questions about sanctions for frivolousness in a case where the underlying suit was voluntarily dismissed. 227 Wis. 2d at 538–39. The court was required to address the merits of the underlying claim to address the frivolousness issue. *Id.* at 572–73.

¶ 84. A similar issue arose in *Lassa v. Rongstad*, 2006 WI 105, 294 Wis. 2d 187, 718 N.W.2d 673. That case involved discovery and contempt sanctions levied against the defendant in a defamation case where the defendant was asserting a constitutional privilege against disclosures sought by the plaintiff. *Id.*, ¶ 1. The merits of the underlying case were settled. The lead opinion determined that the court had to get to the issues of privilege in order to reach the question of

whether the sanctions were appropriate, on the ground that the privilege was a defense against the sanctions. *Id.*, ¶ 33.

■

¶ 85. Similarly, whether frivolous sanctions were proper in the present case turns on whether the underlying suit was frivolous. It was therefore proper for the court of appeals to address that issue despite the fact that summary judgment was not appealed.

¶ 86. The second question is whether the court of appeals erred by reversing the circuit court's summary judgment order. Action Wisconsin asserts that the court of appeals "ignored the finality of the . . . summary judgment decision" and "took jurisdiction of the issue." As we explain in footnote 4 above, the court of appeals reversed the judgment and order of the circuit court. This would appear to include the part of the order denying Donohoo's motion for reconsideration. The text of the opinion makes clear, however, that the court of appeals reversed only the grant of sanctions. Donohoo concedes that the denial of the motion for reconsideration was not reversed.

¶ 87. The third question concerns whether there remain any disputed questions of material fact to be resolved with respect to the defamation issue. The parties agreed at oral argument that there were no factual disputes on the issue. We agree that all of the disputes regarding the defamation claim are legal in nature. Thus, we conclude that although the court of appeals was incorrect in determining that there were disputed facts, it did not err in addressing the facts underlying the circuit court's summary judgment decision. Rather, it addressed the summary judgment decision only to the extent that it was necessary to address

the substantive issues of the case in order to review the circuit court's determinations of frivolousness.

## V

¶ 88. In sum, we conclude that the circuit court did not err in determining that the defamation suit was frivolously commenced and continued under Wis. Stat. §§ 802.05 and 814.025. It determined that Donohoo had failed to conduct a reasonable inquiry before commencing the lawsuit and that there was no basis in fact or law that would support Donohoo's claim that Action Wisconsin's statements were made with actual malice. In this regard, we conclude that the court of appeals committed error when it reversed the circuit court's determinations.

¶ 89. However, we conclude that the court of appeals did not commit error in addressing the circuit court's summary judgment decision. The court of appeals did not sua sponte reverse a grant of summary judgment that was never appealed. Rather, it addressed the summary judgment decision only to the extent that it was necessary to address the substantive issues of the case in order to review the circuit court's determination of frivolousness.

¶ 90. Accordingly, because we conclude that the circuit court did not err in determining that the defamation suit was commenced and continued frivolously, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 91. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). Subsequent to Grant Storms' speech at a

740

meeting of Wisconsin Christians United, Action Wisconsin, Inc. published the following statement on its website:

> We trust that Senator Panzer will be as appalled as we were to find one of her colleagues in the audience for a speech apparently advocating the murder of his own constituents.

Based in part on Action Wisconsin's statement that he was "apparently advocating [] murder" during his speech to Wisconsin Christians United, Storms began this defamation lawsuit. The majority opinion concludes that Storms' lawsuit was frivolous when filed and frivolous when continued.[1] The dispositive questions presented by this review are: whether a reasonable attorney in Attorney Donohoo's position could have concluded that no reasonable jury could find the following facts: (1) Action Wisconsin's statement is false; (2) the statement defamed Grant Storms; and (3) when it made the statement, Action Wisconsin did not believe the statement was true, or made it with reckless disregard as to its truth. *See Baumeister v. Automated Prods., Inc.*, 2004 WI 148, ¶ 28, 277 Wis. 2d 21, 690 N.W.2d 1. Because the law of defamation is complex and often unclear, I conclude that a reasonable attorney in Attorney Donohoo's position could have believed that a reasonable jury could answer "yes" to these questions.[2]

---

[1] Majority op., ¶ 4.

[2] The majority claims that I "implicitly acknowledge[] that a reasonable attorney, and hence Attorney Donohoo, should have known that he could not prove actual malice." Majority op., ¶ 57 n.11. I do no such thing. First, I recognize, contrary to the majority's suggestion, that the inquiry must be focused on what a reasonable attorney would have believed, not what Attorney Donohoo, specifically, believed. *See infra*, ¶¶ 24, 28, 34. Second,

Such a jury then would have found that Action Wisconsin published the statement on its website with actual malice, thereby defaming Grant Storms.[3] *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1270 (7th Cir. 1996) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶ 92. This review arises from Grant Storms' lawsuit against Action Wisconsin as a result of statements that Action Wisconsin published on its website, subsequent to a speech that Storms made to Wisconsin Christians United. Storms' speech spoke of his personal opposition to homosexual lifestyles and his belief that the Bible teaches that homosexuality is a sin.

¶ 93. Action Wisconsin supports gay rights, and was, at the time of the statement on its website, heavily lobbying the legislature against passage of the constitutional amendment, Article XIII, Section 13, that denies marital status to same-sex partners.[4]

---

I conclude, contrary to the majority's suggestion, that a reasonable attorney in Attorney Donohoo's position could have believed that a reasonable jury could have concluded that Action Wisconsin made false statements with actual malice.

[3] Both parties assume that Grant Storms is a public figure. Therefore, even though a complete analysis of this question may not end with that conclusion, I do not address the issue in this dissent.

[4] Article XIII, Section 13 of the Wisconsin Constitution, Marriage Between One Man and One Woman, had not yet reached the voters when Action Wisconsin published its statement about Storms' speech.

¶ 94. The statement that formed the basis for this lawsuit was made on Action Wisconsin's website as a "press release" captioned: "State Senator Attends 'Homo-Fascism' Conference, Action Wisconsin Asks Majority Leader Panzer to Investigate." The press release continued, "[t]oday Action Wisconsin sent a letter to Senate Majority Leader Mary Panzer, calling on her to investigate, identify, and discipline the state senator who attended the 'International Conference on Homo-Fascism' in Milwaukee on October 10, 2003." The press release continued, "[t]he attendance of a state senator at this conference is similar to a senator attending a Ku Klux Klan rally or a neo-Nazi conference, and should receive tremendous scrutiny . . . . We are deeply concerned that a state senator would feel comfortable attending a conference that espoused such frenzied, hysterical hatred." Christopher Ott, Executive Director of Action Wisconsin, is then quoted in the press release as saying:

> We trust that Senator Panzer will be as appalled as we were to find one of her colleagues in the audience for a speech apparently advocating the murder of his own constituents. We also hope that every legislator will think twice before supporting any more hate-inspired legislation.

Storms subsequently found handbills affixed to telephone poles in his hometown of New Orleans, Louisiana, that contained his picture and below the picture it said: "Why does Pastor Grant E. Storms of Christian Conservatives for Reform advocate the murder of gays?" The handbill referred readers to Action Wisconsin's website.

¶ 95. Before Attorney Donohoo filed the defamation action on behalf of Storms, he twice requested Action Wisconsin to retract the statement. Action Wis-

consin did not respond. Also prior to filing this lawsuit, Attorney Donohoo listened to and analyzed Storms' speech and he concluded that no reasonable person would conclude that Storms was advocating the murder of homosexuals.

¶ 96. After the lawsuit was filed, an attorney for Action Wisconsin wrote Attorney Donohoo threatening him with her intent to seek an award of attorney's fees under Wis. Stat. § 814.025 and to report him to the Office of Lawyer Regulation if he did not dismiss the lawsuit. The basis for these threats was the attorney's conclusion that the lawsuit was frivolous because "the Defendants did not say that Mr. Storms advocated murder, but rather that he appeared" to be doing so. The attorney italicized the word "appeared" and asserted that the statement that Storms was apparently advocating murder was Action Wisconsin's reasonable opinion and therefore not actionable. Action Wisconsin's attorney further asserted that she believed Storms was a public figure and therefore, Storms would have to prove actual malice in order to succeed in his lawsuit. She asserted "there is no evidence from which you can even argue actual malice."

¶ 97. After the lawsuit was commenced, Attorney Donohoo had two of his law clerks and two others persons listen to Storms' speech. Each person told Attorney Donohoo that he did not believe Storms was advocating the murder of gay people.

¶ 98. The circuit court dismissed Storms' lawsuit upon Action Wisconsin's motion for summary judgment. In so doing, the circuit court found numerous facts, even though the matter was before the court on summary judgment. It found that Storms failed to prove Action Wisconsin's statement was false; that Action Wisconsin's interpretation of Storms' speech was not unreasonable;

and that Storms had failed to present evidence of actual malice. Without articulating the legal standard that is to be applied to motions to conclude that an action was frivolous to commence or to continue, the circuit court so concluded and awarded Action Wisconsin more than $87,000 in costs and fees against Attorney Donohoo.

¶ 99. Attorney Donohoo appealed and the court of appeals reversed. *Donohoo v. Action Wis., Inc.*, No. 2006AP396, unpublished slip op. (Wis. Ct. App. May 30, 2007). It concluded that "This case is not about whether the trial court correctly decided the summary judgment issue. ... [T]he case is controlled by the frivolous action standards, which are different than those governing summary judgment." *Id.*, ¶ 9. The court of appeals concluded that the circuit court erred in three respects: (1) there were disputed issues of material fact relative to the issue of actual malice; (2) damage to reputation is presumed when defamation based on libel is proved; and (3) Attorney Donohoo engaged in a reasonable inquiry prior to and subsequent to filing Storms' lawsuit.

## II. DISCUSSION

### A. Standard of Review

¶ 100. We review whether the commencement or continuation of a lawsuit is frivolous and therefore a violation of Wis. Stat. § 814.025, as a mixed question of fact and law. *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 562, 597 N.W.2d 744 (1999). What an attorney knew or should have known is factual. *Id.* at 562–63 (citing *Juneau County v. Courthouse Employees*, 221 Wis. 2d 630, 638–39, 585 N.W.2d 587 (1998)). A circuit court's determinations of historical facts will be overturned only if they are clearly erroneous. Wis. Stat.

§ 805.17(2). The ultimate conclusion of whether the factual findings meet the legal standard of frivolousness is a question of law. *Jandrt,* 227 Wis. 2d at 563.

¶ 101. Whether a lawsuit is commenced in violation of Wis. Stat. § 802.05 is a discretionary determination of the circuit court. *Id.* at 548. Section 802.05 applies only to commencing a lawsuit; it does not apply to the continuation of a lawsuit. *Id.* at 547. We will not reverse a circuit court's discretionary determination unless an erroneous exercise of discretion has been shown. *Id.* at 549. Applying an incorrect legal standard is an erroneous exercise of discretion. *City of Brookfield v. Milwaukee Metro. Sewerage Dist.,* 171 Wis. 2d 400, 423, 491 N.W.2d 484 (1992).

¶ 102. Whether a communication can reasonably be understood as defamatory, is a question of law. *Starobin v. Northridge Lakes Dev. Co.,* 94 Wis. 2d 1, 10, 287 N.W.2d 747 (1980) (citing *Martin v. Outboard Marine Corp.,* 15 Wis. 2d 452, 461, 113 N.W.2d 135 (1962)). We review questions of law independently, but benefiting from the prior decisions of the court of appeals and the circuit court. *Marder v. Bd. of Regents of the Univ. of Wis. Sys.,* 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110.

B. Frivolous Action Principles

¶ 103. An attorney files or maintains a frivolous action when the attorney "knew, or should have known" that there was no "reasonable basis in law or equity" for it. Wis. Stat. § 814.025(3)(b). Only when there is *no* reasonable basis for the claim, in fact, or in law and no basis for a reasonable extension of the law to include such a claim, may a court conclude that it is frivolous under § 814.025(3)(b). *Jandrt,* 227 Wis. 2d at 573. A

similar lack of basis in fact or in law causes a claim to be frivolous under Wis. Stat. § 802.05. *Id.* at 550. In determining whether a claim is frivolous, a court must balance the integrity of the judicial process, *id.* at 572; *Sommer v. Carr,* 99 Wis. 2d 789, 799, 299 N.W.2d 856 (1981), with the desire to encourage "ingenuity, foresightedness and competency of the bar," *Radlein v. Industrial Fire & Casualty Insurance Co.,* 117 Wis. 2d 605, 613, 345 N.W.2d 874 (1984). All doubts about the reasonableness of a claim must be resolved against the party asserting that the action is frivolous, unless the claim was brought solely to harass or injure the other party.[5] *Baumeister,* 277 Wis. 2d 21, ¶ 28.

C. Defamation Principles

¶ 104. An action for defamation requires proof of the following elements:

(1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Torgerson v. Journal/Sentinel, Inc.,* 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997). When a public figure is the person defamed, actual malice must also be proved. *Id.* at 535.

¶ 105. The requirement of proving actual malice arises because "[t]he First Amendment imposes a constitutional privilege on the publication of statements

---

[5] Action Wisconsin maintained that Storms' defamation action was frivolous because there was no basis in law or in fact for it.

about public figures, even when those statements are false and defamatory." *Id.* This privilege, which is grounded in the First Amendment, is not absolute, but rather, conditional. *Id.* That the declarant make his or her statement without actual malice is the condition that is imposed on the privilege. *Id.*

¶ 106. In order to prove actual malice, a plaintiff must show that the defamatory statement was published with knowledge that it was untrue or with reckless disregard as to its truth. *Sullivan,* 376 U.S. at 279–80. The test for whether the defendant had actual malice is subjective. *Torgerson,* 210 Wis. 2d at 542. The plaintiff must show that the defendant either knew the statement was false or "entertained serious doubts as to the truth" of the statement. *Id.* Actual malice can be shown by proof that the defendant had "obvious reasons to doubt the veracity" of the statement. *Id.* at 543 (citing *St. Amant v. Thompson,* 390 U.S. 727, 732 (1968)).

¶ 107. The defamation at issue here is in the form of libel because the statement was written. *Martin,* 15 Wis. 2d at 456. As such, the statement is "actionable without alleging or proving special damages."[6] *Id.* at 460–61. As *Martin* explained, "We adhere to and adopt the common-law rule of libel, as stated in sec. 569 of the Restatement, 3 Torts, Defamation, that all libels are actionable without alleging or proving special damages." *Id.* Damages are presumed from proof of the defamation by libel. *Id.*

¶ 108. However, whether a statement is capable of a defamatory meaning is a separate question. *Id.* at 461. This determination is initially for the court. *Id.* If a

---

[6] This is contrary to the rule in regard to defamation in the form of slander, where special damages must be pleaded and proved. *Martin v. Outboard Marine Corp.,* 15 Wis. 2d 452, 461, 113 N.W.2d 135 (1962).

court concludes that the only possible meaning of the statement is defamatory, the court may hold the statement defamatory as a matter of law, and no question goes to the jury. *Id.* at 461–62. However, if the libel is "capable of an innocent meaning as well as a defamatory meaning, it is then for the jury to determine whether the communication capable of a defamatory meaning was so understood by its recipient." *Id.* at 462.

¶ 109. Statements phrased as opinions are not beyond the reach of a defamation claim. *Converters Equip. Corp. v. Condes Corp.*, 80 Wis. 2d 257, 263, 258 N.W.2d 712 (1977). As we have explained, writings that add words such as "apparently" and "appear to be" change nothing. *Id.* "The authorities agree that communications are not made nondefamatory as a matter of law merely because they are phrased as opinions, suspicions or beliefs." *Id.* at 263–64. Accordingly, such words as "apparently," which Action Wisconsin used here, at most, create a jury issue in regard to whether the statement defamed Storms. *See id.* at 264.

D. Storms' Defamation Claim

¶ 110. Action Wisconsin's statement on its website that Storms was "apparently advocating the murder" of homosexuals is the focus of this lawsuit. The handbills distributed by an unknown person in Storms' hometown of New Orleans, Louisiana, repeated Action Wisconsin's assertion by asking, "Why does Pastor Grant E. Storms of Christian Conservatives for Reform advocate the murder of gays?" Action Wisconsin's website was listed at the bottom of the handbill. A copy of the handbill was attached to Storms' complaint.

749

### 1. False statement

¶ 111. The circuit court based its decision in part on its finding that Storms failed to prove Action Wisconsin's statement was false. However, whether a statement is false or substantially true is a factual determination unsuitable for summary judgment, unless no reasonable person could conclude otherwise than that the statement was false. *See Martin,* 15 Wis. 2d at 462.

¶ 112. Action Wisconsin does not assert that its statement is true; rather, it asserts it is insulated from a defamation claim because it used the word, "apparently," before its statement that Storms was advocating the murder of homosexual people. It implies that the word, "apparently," shows that the statement was Action Wisconsin's opinion.

¶ 113. However, "apparently" has been defined as, "in an apparent manner," and "apparent" has been defined as, "capable of easy perception" and "real or true and supported by credible evidence." *Webster's Third New International Dictionary,* 102–03 (1961 ed.). Moreover, as we explained in *Converters,* using the word, "apparently," before a statement that is false does not insulate the declarant from a defamation action. *Converters,* 80 Wis. 2d at 263–64. Furthermore, "One may be libeled by implication and innuendo quite as easily as by direct affirmation." *Id.* at 264. Employing "apparently" before a statement that is false can do no more than create a jury issue in regard to whether the statement defamed the person about whom the statement was made. *Id.* at 263–64.

¶ 114. Here, the publisher of the handbills had seen Action Wisconsin's statement, as is shown by the reference to Action Wisconsin's website at the bottom of

the handbill. It interpreted Action Wisconsin's statement to mean that Storms was advocating the commission of crimes: the killing of homosexual people. Four people who listened to Storms' speech at Attorney Donohoo's request all concluded that Storms was not advocating murder. A jury reviewing Storms' entire speech to Wisconsin Christians United could find that Storms was not advocating the murder of gay people; and therefore, Action Wisconsin's statement was false.[7] Therefore, a reasonable attorney in Attorney Donohoo's position, could conclude that Action Wisconsin's statement was false. On the record before us, it remains, at most, a fact question for the jury.[8]

¶ 115. Prior to filing this lawsuit, Attorney Donohoo listened to Storms' speech and analyzed it under legal principles relating to defamation. The court of appeals did so as well. Both Attorney Donohoo and the court of appeals and three members of the Wisconsin Supreme Court have concluded that a reasonable attorney in the position of Attorney Donohoo could have

---

[7] This writer has listened to the entire recording of Storms' speech.

[8] The statements in ¶ 56 n.11 of the majority opinion exemplify the incorrect standard that the majority opinion has applied throughout its opinion in determining whether Storms' defamation claim is frivolous. The question is not whether a reasonable jury would find for Storms on each element he had to prove in his defamation claim, but rather, whether a reasonable attorney in the position of Attorney Donohoo could believe it was possible for a reasonable jury to find in Storms' behalf. *Baumeister v. Automated Prods., Inc.,* 2004 WI 148, ¶ 28, 277 Wis. 2d 21, 690 N.W.2d 1. As we explained in *Baumeister,* "This court does not look at whether one can prevail on his claim, but whether the claim is so indefensible that the party' or his attorney should have known it to be frivolous." *Id.*

751

concluded that a reasonable jury could find that Action Wisconsin's statement was false.

2. Defamatory meaning

¶ 116. A statement is defamatory when it tends to " 'diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.' " *Starobin,* 94 Wis. 2d at 10 (quoting Prosser on Torts 756). A statement that implies that the defendant has committed a crime may be defamatory. *Bauer v. Murphy,* 191 Wis. 2d 517, 524, 530 N.W.2d 1 (Ct. App. 1995). Here, Action Wisconsin's statement has been interpreted by at least one person, the printer of the handbills referenced above, to mean that Storms was advocating the murder of homosexuals.

¶ 117. Whether a statement could be interpreted in a defamatory sense is initially a question of law for the circuit court to address. *Martin,* 15 Wis. 2d at 461–62. When libel is capable of an innocent and a defamatory meaning, a jury question is presented. *Id.* at 462. The court of appeals concluded that Action Wisconsin's assertion that Storms was apparently advocating murder of homosexual people was capable of a defamatory meaning. *Donohoo,* No. 2006AP396, unpublished slip op., ¶ 17. I conclude that a reasonable jury could find that Action Wisconsin's statement has been received as reporting that Storms was advocating the killing of gay people. Accordingly, a jury question is presented in regard to whether the statement was defamatory.

¶ 118. However, the relevant question for this review is whether a reasonable attorney in the position of Attorney Donohoo could conclude that a reasonable jury could find that Action Wisconsin's statement de-

famed Storms. *Radlein,* 117 Wis. 2d at 612. Prior to filing the lawsuit, Attorney Donohoo investigated the law relating to libel, as is shown by the detailed letters he wrote to Action Wisconsin requesting retraction. Once the lawsuit was underway, he had four individuals listen to the full recording of Storms' speech and none interpreted the speech as Storms' advocating the murder of homosexual people. Attorney Donohoo also obtained a copy of the handbills that were distributed after Action Wisconsin posted the statement on its website. Both Attorney Donohoo and the court of appeals and three members of the Wisconsin Supreme Court have concluded that a reasonable attorney in the position of Attorney Donohoo could have concluded that a reasonable jury could find that Action Wisconsin's statement was defamatory.

### 3. Actual malice

¶ 119. When a public figure claims defamation, he or she must prove that the declarant made the statement with actual malice, that is, that the declarant knew the statement was false or made it with reckless disregard as to the truth. *Sullivan,* 376 U.S. at 279–80. Because actual malice involves the subjective state of mind of the declarant, *Torgerson,* 210 Wis. 2d at 542, here Ott, it may be proved by showing that the declarant had "obvious reasons to doubt the veracity" of the statement. *St. Amant,* 390 U.S. at 732. Proof of actual malice involves the circumstances under which the statement under examination was made. *See Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 917, 447 N.W.2d 105 (Ct. App. 1989).

¶ 120. The context in which Action Wisconsin's statement was published is relevant, both in regard to where and when it was made. *See St. Amant,* 390 U.S. at

733. First, Ott's statement was made in a "press release" by Action Wisconsin that requested Senator Panzer to take action against members of the legislature. It began by asserting, "State Senator Attends 'Homo-Fascism' Conference, Action Wisconsin Asks Majority Leader Panzer to Investigate." It did not ask her to investigate whether Storms was advocating murder, but rather to "investigate, identify, and discipline the state senator" who attended the religious convocation of Wisconsin Christians United, which convocation Action Wisconsin characterized as a "homo-fascism conference." After making the statement that Storms asserts is libelous, Ott focused on potential legislation and said, "We also hope that every legislator will think twice before supporting any more hate-inspired legislation."

¶ 121. Second, the statement was made during the course of the legislative initiative to amend the Wisconsin Constitution to limit marriage to heterosexuals and to prevent civil unions for homosexual couples. Action Wisconsin saw such an amendment as contrary to the civil rights of homosexuals, whom it supports. The "marriage amendment" was a highly emotional topic on both sides of the issue and the political pressure placed on members of the legislature was intense. Therefore, Action Wisconsin's call to action to make "every legislator [] think twice before supporting" the upcoming constitutional amendment can be read as an effort to make voting for the proposed amendment more difficult, rather than as a call to action based on Action Wisconsin's belief that its statement about Storms was true. Furthermore, there is nothing in the record to show that Action Wisconsin turned the recording of Storms' speech over to law enforcement and requested an investigation of his activities, which one

might expect it would have done if it truly believed Storms was advocating murder.

¶ 122. Given the context of where (as a press release placed on the internet) and when (during the legislative debate on a highly charged issue on which Action Wisconsin had taken a position), Action Wisconsin had an obvious reason to make legislative members uncomfortable for their association with Storms and his beliefs, even while doubting the truth of its allegation against Storms. *St. Amant,* 390 U.S. at 732 (citing *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 169–70 (1967) (Warren, C.J., concurring in the result)). Stated otherwise, a reasonable attorney in the position of Attorney Donohoo could have believed that a reasonable jury could find that Action Wisconsin knew the statement was not true or made it with reckless disregard as to its truth, because the statement was part of Action Wisconsin's attempt to promote one side of a highly charged political issue. If the jury so found, then Attorney Donohoo would have proved that Action Wisconsin published the statement on its website with actual malice.

¶ 123. I agree with the court of appeals that this action was not commenced in violation of either Wis. Stat. § 814.025(3)(b) or Wis. Stat. § 802.05; nor was it continued in violation of § 814.025(3)(b). A determination of frivolousness involves a delicate balance. The question of whether an action was commenced or continued in violation of a statute is not determined in the same way that a motion for summary judgment or a motion to dismiss is determined, *see Stoll v. Adriansen,* 122 Wis. 2d 503, 509, 362 N.W.2d 182 (Ct. App. 1984); yet, the circuit court did not articulate or apply a different standard for these differing legal issues.

¶ 124. In order to be frivolous under either Wis. Stat. § 814.025(3)(b) or Wis. Stat. § 802.05, a circuit court must conclude that *no* reasonable attorney in Attorney Donohoo's position could have concluded that a reasonable jury could find in favor of the plaintiff. *Swartwout v. Bilsie,* 100 Wis. 2d 342, 350, 302 N.W.2d 508 (Ct. App. 1981). Any doubts about how a jury could find must be resolved against the person claiming that the action was frivolous. *Id.* While the record is a long way from proof of the claim that Attorney Donohoo asserted, I cannot conclude that no reasonable attorney in Attorney Donohoo's position could have concluded that a reasonable jury could make the findings necessary to support a verdict in favor of Storms' defamation claim. Accordingly, the defamation claim is not frivolous.

## III. CONCLUSION

¶ 125. The dispositive questions presented by this review are: whether a reasonable attorney in Attorney Donohoo's position could have concluded that no reasonable jury could find the following facts: (1) Action Wisconsin's statement is false; (2) the statement defamed Grant Storms; and (3) when it made the statement, Action Wisconsin did not believe the statement was true, or made it with reckless disregard as to its truth. Because the law of defamation is complex and often unclear, I conclude that a reasonable attorney in Attorney Donohoo's position could have believed that a reasonable jury could answer "yes" to these questions. Such a jury then would have found that Action Wisconsin published the statement on its website with actual malice, thereby defaming Grant Storms.

¶ 126. Because the majority opinion concludes otherwise, I respectfully dissent.

¶ 127. I am authorized to state that Justices DAVID T. PROSSER and ANNETTE KINGSLAND ZIEGLER join this dissent.

## STORMS
## CD TRANSCRIPTION

One small church in New Orleans, outside of New Orleans, Marrero, and I do a radio program called The Reformer Radio Broadcast. We do an hour talk show every day. We've been doing that for a couple of years, or eight years, going on eight years. It's been the last couple of years we've really been seeing some tremendous breakthroughs that we're so thankful for. And a few years ago I started a group called Christian Conservatives for Reform, and it's of course an activist movement and an organization we're trying to get pastors and Christians to get off their pews outside the four walls of the church and engage our society and we tell them don't overlook things that you see are wrong in society. Do something about it. Whatever it may be. And we've done a number of things and the Lord has granted us a number of successes and we're thankful for that. Of course the Lord has used us in this battling the Southern Decadence situation in New Orleans which we'll go into in just a few moments. But I just want to say I'm very, very thankful to be here. I at least know one familiar face, Brother Cal Zastrow. Brother Cal good to see you again. He is doing some tremendous work with the Constitution Party and I've met him in New Orleans and he's been down there trying to get some Christians to wake up to the fact that the Republican Party is not necessarily our allies and our friends especially when it comes to the homosexual issue. But our nation is in a real critical situation, and if there was

ever a time for the church and the Lord Jesus Christ to stand up, it's certainly now. Amen.

Turn your Bibles this morning to 1 Samuel 14. It's so awesome coming in. I'm originally from New York and I haven't been up north here and heard the word "pop" in a long time. (Laughing) I still use the word "sneaker" but not "pop". But we're asking about if the leaves were changing. By the way Ralph I don't have a watch either so. (Laughing) We're asking about whether the leaves were changing and everybody was saying oh no not yet, not yet. So it's a real blessing we're coming in and looking down on the trees and seeing them change colors and that was pretty awesome. My wife has never been up north during the Fall. It's been nineteen years for me. I'll go back to New York during the winter to catch the snow, so it's a real blessing and got a good night sleep and woke up, left the room early to go over here to get some breakfast and got that morning northern chill. Said Yes. Alleluia. Praise the Lord.

I want to read one verse. We're actually going to come back to this passage and go through the first 23 verses which is the story of Jonathan and the armor bearer. But let's start out reading the first verse this morning. 1 Samuel 14:1 *Now it came to pass upon a day that Jonathan, the son of Saul, said unto the young man that bear his armor, "Come and let us go over to the Philistines garrison."* Father we come before you in Jesus' name and Lord we come to you humbly and ask you to bless and move, we ask you Lord to annoint with your Holy Spirit. But we realize this morning that we're really nothing without you. We can do nothing without you. It's not by our personalities or our intelligence or our wisdom, our own widom, or even our own strategies. But it's only by your Spirit we recognize today. It's

not by might nor by power, but only by your Spirit, so we pray for your annointing to stir your church up. Those that are called by your name as they humble themselves and turn from their wicked way, pray and seek your face. We pray Lord that you will forgive and hear our prayers and begin to heal our land. We pray for reformation in this nation, revival. We pray for third grade awakening in this nation and we pray Lord let it start right here in Milwaukee, Wisconsin on this day. In Jesus' name and everyone said Amen and Amen.

I want to speak for a few moments this morning now on the thought of you alone can make a difference. You alone can make a difference. And it's a beautiful story here in the first 23 verses of 1 Samuel 14 about Jonathan and the armor bearer defeating the army of the Philistines. Now for the sake of this conference just keep in mind that we're going to liken the Philistines unto the homosexual movement today. But this passage has a very special place in my heart because it was the passage, this passage in this story, that the Lord used to call me into the ministry. Twenty-three years ago I had just got saved out of drugs and alcohol and still had my long hair and all that kind of stuff. Been about two weeks saved and the Lord led me to church and I'm sitting in there and here comes this radical evangelist and he preached out of this passage of scripture. He entitled the message What One Man Obedient to God Can Do. What one man that's obedient to God, what God can do with one man that's obedient to God. And man the Holy Spirit dragged me down to that alter. I mean filled me with the Holy Spirit. Totally, radically changed me. I got up from there and I knew that I was called to preach and now I'm of course entitling this this morning, You Alone Can Make a Difference, and I hope

759

and pray that it will have the same effect on some of you that it had on me. But I left that service with the call of God on my life to preach and the understanding that if I was obedient to God that God could use me in a mighty way. Just me. Just me. Just me alone. It wasn't going to take an army. Just me alone. So this passage has a very special place in my heart and so I'm looking forward and been looking forward to preaching it this morning when of course the Lord laid it on my heart to preach I was excited and thankful.

I want to share a couple of things before we get into this passage of scripture though and share a little bit about our battle to stop Southern Decadence in New Orleans. We've been fighting the homosexual thing for a long, long time. We've been on the radio years ago just preaching about the agenda and most all the things we were warning the church about has come to pass. In just twelve years. And so we weren't, the Lord was using us if you will to fight this homosexual agenda for a number of years, and I guess there's a point in that, in that don't be weary in well doing. And he sees you fighting and laboring and struggling and being frustrated and so forth. Hang in there. You'll get your breakthrough. And so the Lord gave us a great breakthrough with this Southern Decadence. That's not to say we didn't have successes before. We would go to the City Hall. We'd cry out. We would go to the State Legislature and try to fight homosexual legislation. And you know we had our victories. The Lord helped us to do some things. But we got our breakthrough with this Southern Decadence. Now what happened with this Southern Decadence. Well first of all let me tell you what it is. It's a big homosexual festival where 100,000 homosexuals come in from all over the nation. They call

760

it the "Gay Mardi Gras" and it's notorious for its lewdness and indecency and public sex and what you have is you have 100,000 homosexuals come in, 100,000 middle-aged, potbellied, bald-headed men running around in thongs with their full buttocks exposed on the streets getting drunk for three days on Labor Day Weekend. It's been going on for 32 years. In 2001, two years ago, I was in the French Quarter looking for some of the members of my church who were down there street preaching. Got our communication line messed up, and I ended lip with a friend of mine from Chicago who's down there with me, end up right in the epicenter of this Southern Decadence Festival and saw in the middle of the street, now I won't go into detail because I don't want to offend anyone, but just to put it mildly we saw an orgy in the streets, and they were doing it with impunity. No police presence whatsoever. Which gave me the impression that the police were making back room deals with them. District 8 Police Department in the French Quarter. Making back room deals with the homosexuals to let them go ahead and have their orgy in the street and their big party, and with impunity. So I couldn't believe what was going on, and then I began to share what I saw for the next year and I would tell pastors what I saw and they would look at me and go nah. So I mean I knew what I had to do. I had to go down there and videotape it the following year if I was going to really make people, cause they weren't believing me, if I was going to make people believe me then I was going to have to show them. So that's what we did in 2002. We went down there and we videotaped them. About 30 or 40 minutes of an orgy in the street. We took it to the media. We took it to the police. We took it to the mayor. We took it to the City Council persons. We took it to pastors. The media went crazy with it. And it

became immediately the talk of the town. We tried to seize the moment and had a little press conference a few days after the news broke. Had about thirty people, eight to ten pastors, something like that. The media gave it great coverage. The city was in an uproar. All over the talk radios and so forth. But it didn't go away after that. It didn't go away. The momentum kept on going. We kept on getting the video out there. There was something that was driving us, saying it's not over. It's not over. Keep this thing going. And so the momentum just kept on building so we had a rally about a month later. And at this rally we had about 25 pastors and 150 Christians on a Friday afternoon at City Hall. And so we started to see that God, we believe, was going to use this in a tremendous way. Got a call from the mayor. "Reverend Storms, I saw the video. I couldn't watch the whole thing. The mayor fine. Now what you need to do is you need to what you told me you need to get on my radio program and you need to tell it to the city." Now here's what happens with politicians. They want to tell you personally they're on your side. But they won't go public with it. So we demanded you got to go public with this and publicly denounce it and say you don't want it in the city any longer. He wouldn't do it. Then immediately after that I got a call from Captain Dabdaub of the 8' District Police Department and he's talking and "we want to work with you Brother Reverend Storms" blah, blah, blah. And I discerned what they wanted to do was kind of placate me so I would call off the dogs so to speak. So oftentimes they do that with our leaders. Here's what they do with the Pat Robersons and the Jerry Fallwells of the world. "Come to the White House." (Laughing) "The White House, the Oval Office?" Remember Gary Bower a bunch of our pastors of Louisiana went to Washington and Gary Bower had

them all over for dinner. And Gary Bower said this to them when he said when he was working with the Reagan Administration, he saw some things that he didn't like. And he was praying at some pastors that would go through the Oval Office, would pull Ronald aside and say, "Hey, you're a good man overall, but blah, blah, blah". But here's what Gary said they would do. There's two things they wanted to do. They wanted to pray for Ronald Reagan and they wanted a picture with Ronald Reagan. (Laughing) You know we're not going to change our society if all we want to do is succeed so to speak to get to a place where we have a seat at the table. I don't want a seat at the table. I could care less if I have a seat at the table. I want our society to change. So we didn't bow down to the mayor or the city or the police. We said look we want this thing ended and if you're not going to do something about it, we're going to pray to God to give us wisdom and understanding and give us ways to stop it. So we took the video to the state legislature. The City of New Orleans, worthless, gone. Given over to reprobate that city's gone. Alright we'll take it to the state. So we took it to the state legislature. It happened to be the Chairman of the Criminal Justice Committee. Said "Here's what we'll do Reverend Strong. We'll pass a law making it a mandatory ten day jail time for anyone convicted of public sex." He did. It passed 100 to 0 in the House. 37 to 0 in the Senate. The governor signed it, but more than that the national media went crazy over it. We were doing interviews in the New York Times, News Piece, or News Week did a big piece on us. It was Danny Martini was representing. Martini was on the Bill O'Reilly Show. The media went crazy. All over the state. So now all of a sudden. Why did you have a law like that. Well because of this video. Because of this video Reverend Storms gave me. So now it's all over the

state. It's all over the nation, and the homosexuals are going crazy. It kicks in two weeks before the 2003 Southern Decadence. They're running around. Scurrying around. Handing out condoms with the labels on it. "Public Sex Equals Ten Days in Jail." So now the media is picking that up and it's going crazy and we're preparing for the 2003 and so here's what we decide to do. We're not going away. What we're going to do is we're going to have a rally. We're going to have a march. We're going to march right into the epicenter of this Southern Decadence Festival, and we're going to get right in their faces, and we're going to say, "We dare you now to have an orgy in front of us" with our video cameras. "We dare you." We figured we bring the police (blah, blah, blah) in the media. So the police picked up on that. It was all over. We were doing interviews. You're going to march right in we're marching right smack dab with hundreds of Christians right in the middle of it. So the police (Laughing) Yeah. Come on. We understand you applied for a permit for the Armstrong Park and a parade permit. Now you know we can't give that to you. Oh yeah we knew that. We don't really want it. We just did that because we spoke to some lawyers with the Alliance Defense Fund who said just go ahead and do that and then we'll sue them when they deny us. (Laughing) The next day I get a call, "Reverend Storms all your fees on Armstrong Park were waived. You can have it. And also we got your parade route. We hope you like it. We're going to give you a police escort. All your fees are waived." How many police are going to be there. "Oh you're going to be better protected than the president, we guarantee you." (Laughing) "Oh we're going to have horse police officers or what do they call them mounted police. We're going to have police cars. Police motorcycles. Motorcycle cops." It's all on the video. I encourage you to get the video. In other words they

wanted, it was advantageous for them number one not to get sued by a bunch of radical Christians. And number two, they didn't want a riot to break out. So we had police protection. And they gave us two blocks of Bourbon Street, which they don't do in New Orleans on a Friday night. Especially to Christians. So I'll tell you there was no greater thrill than to walk around, come down Conti Street which is a side street in the French Quarter. Come around on Bourbon Street with a police escort, motorcycle cops going by you on the street, with their sirens and you're singing "Our God is an Awesome God" (laughing) and having people all over on both sides of the streets in the hard core section of Bourbon Steet (clapping) where all the, you know what's his name the guy with uh Larry Flint. His club's there. And heterosexuals looking at us with drinks in their hands, because you can drink on the streets in New Orleans, and they're like "What is going on here." And then to march right into the epicenter of the homosexual, not with the police escort, they stopped us a couple of blocks, but they knew we were going, they went in there with us and it was just awesome what the Lord did. I encourage you to get the video. ABC Prime Time covered us. Did a great piece. Eight minute piece. They played Monday night, all over the nation. We're getting calls all over the nation of what the Lord, or from people are inspired by what we were able to do. Of course they're saying "Oh these guys are courageous down there." We're not courageous.

We're crazy. (Laughing) But we thank the Lord for the victory that he has given us and I am confident Brother Ralph we can win this thing. I am confident that we can turn this thing around. Now we started to take radio calls from all the Christians that were down there. We had 400 Christians. 50 black, 50 white. All these pastors

talking about racial unity and racial reconciliation, and trying to maneuver it and everything and bring it about. Look here. You want God. When you stand up against the enemy and go forward, all these things just fall into place. So Christians were excited, fired up, revived. We're seeing reformation. The city is beginning to take us serious now to changing things. There was no public sex. The crowds at Southern Decadence were down. The police presence was way up. (Blah, blah, blah) the arrests. Reformation is beginning and the church is revived in New Orleans and we're excited about what the Lord is doing.

Turn in your Bibles now for just a moment. Keep your finger there in 1 Samuel 14. Let's go to Genesis 19 for just one moment. Let's go to Genesis 19 for just one moment. Because I'm likening the homosexual movement here to the Philistines, and I want to let you know that the homosexual movement today is very similar to the first one found in Genesis 19. In Genesis 19:4, I want to point out a few things here. The Bible says in Genesis 19:4 *"But before they lay down the men of the city even the men of Sodom can pass the house round both old and young all the people from every corner."* The first point I want you to understand about this homosexual movement and the characteristic of the modern day homosexual movement which is similar to the first homosexual movement is number 1 this solidarity. There's an uncanny unity in solidarity amongst the homosexuals. It's almost unnatural when they go to a city. What do they do? They go to one neighborhood. One part of the city and they live there. And they're solidified. Man I'm telling you when you unite people, they're strong. And the reason I'm saying this is because I don't want you to underestimate this movement. I'm

766

not saying fear, we can defeat it. But don't underestimate it. They are a group that are solidified. And you can see this in the old and young. Rich and poor. Black and white. They're unified. There's solidarity among them. Not only that and it should teach us a lesson, we need to come together and unite. Verse 5 *"And they called upon Lot or unto Lot and they said unto him 'where are the men which came into thee this night bring them out unto us that we may know them.'* You know what it means to know them, they wanted sex. They're single minded. Not only are they solidified or have solidarity, they're single minded. One thing drives the homosexual movement. One thing. You know what that is? Sex. The festivals are about sex. The gatherings are about sex. Their entertainment is about sex. They have one thing and that's single mindedness. I'm telling you. I believe that's the reason why they have the successes that they've been having. They're solidified. They're single minded. Don't underestimate them.

Another point here I want you to notice in verse 9 *and they said "Stand Back".* They said again. This one fellow came in to Sojourn and he who needs be a judge now we will deal worse with thee than with them and they press so upon the man even Lot and they came in to break the door. They are a scornful people. They hate us. They have contempt for us. Stand back. Who are you to say you can't tell us what to do. Who are you to say which a sin. We need to understand that. Don't think you're going to tiptoe out there and say hey, repent. They will want to kill you. You would not believe, well you would believe the things that they've written about us and they've done and the threats and everywhere we go. We announce something on the radio that we're going to go somewhere and the streets are plastered with posters of

my picture saying I'm this, I'm that, I'm the other thing. They have contempt for the things of God and for anyone that would dare to stand up and their message is to us "Stand back. Get out of our way. Who do you think you are to judge us." If you're a little timid and fearful, you better get the Holy Ghost on you. This is a scornful people. They are. They are. They are a scornful people. And then secondly in this passage I think you can see a stubbornness there. Stubbornness. We go up to the state legislature and we kill and crush and just and we kill their legislation. They had put billboards up and they'll get rally people and they'll have commercials and pass the employment non-discrimination act. All this discrimination is homosexualist, terrible, blah, blah, blah, and we go up to the legislature and we kill it. The next year they're back up there. They're back up there. And they just keep coming, and coming, and coming, and coming. They are a stubborn people and they don't care. They want to trample us. Look at. Here is a situation. Brother Ralph said it was a serious situation. Here it is. It's us or them. There's no in between. There's no having this peaceful co-existence. They have to eliminate us and the Word of God if they want to succeed. It's almost like communism and capitalism. It's going to be one or the other. You can't have both. You can't peacefully co-exist. A nation divided can't stand. Either they're right, or we're right. Either we're going to succeed or they're going to succeed. Either it's going to be a homosexual, anti-God nation, or it's going to be a nation that stands for God and says that that thing is sin. It can't be both. Won't be both. Something's going to happen. Either they'll crush us and have laws and silence us and kill the ones that won't be silenced or imprison the ones that won't be silent, or the church or the Lord Jesus Christ will rise

768

up and say this is a Christian nation. This is the way it will remain. Go back in the closet.

All right let me preach here this morning. Let's go back to 1 Samuel 14. See Brother Grant. What are you trying to say. I'm trying to say this morning this. You alone can make a difference. You alone this morning can make a difference. I want you to go home with that, that, that thought. That you alone dedicated to God. Committed to God. Say it in your heart and in your spirit. Come and let us go over to the Philistine Garrison. Let's us go over to this homosexual movement. Let's us stand up against this homosexual movement. Wherever it may be found. Understand they're solidified. Understand their solidarity there. Understand their singleness in mind and purpose there and that they're strong and we shouldn't underestimate them. And understand they're scornful, and understand their stubbornness, but and with our God we can defeat them. Now this first verse one of the characteristics we see and it's not bad. A lot of times we get mad saying things of the devil and it's not of the devil. It's of God. What do we see here in the first verse of 1 Samuel 14. Jonathan, what's his disposition here. I believe his disposition is frustration. Here you see the Philistines over there and we're going to get into the next verse here in just a moment. But he sees Saul and the army over here and the pomegranate tree. And he says "hey something's not right with this picture over here" and so he's frustrated and and he says to his armor bearer essentially "Come on if anything's going to be done here we're going to have to go do it." And it's a divine frustration. So if you're frustrated about seeing the homosexuals taking over our nation. That's a good thing. If the frustration is of God trying to prompt you up to say "Hey let's go do something". You alone can make

769

a difference. So you see. Jonathan is frustrated here. And he says to his armor bearer "Come out and let's go do something." What added to his frustration. Verse Number 2. Saul, in the outermost part of Gibeon under a pomegranate tree which is at Michon and the people that were with him were about 600 men. Well I likened that unto the church. You have Dr. Saul, a pastor of First Baptist Church, Assembly of God, Ph.D. DD. Hallelujah with his 600 disciples. Dearly Beloved. We're going to dissect the Word of God here this morning. We're going to get into the Greek and the Hebrew and there's nothing against getting into the Greek and the Hebrew. Obviously he came from Dallas Theological Seminary. (Laughing) We're going to go over here and under the pomegranate tree so we're out of the way and we can have peace. And there's a Philistine camp over there, knocking our God, hating us, and ready to take over. Ready to take over their, the Philistine Army. There's a Philistine Army out there, it's called the homosexual movement. Whether you can see it or not, understand it or not, they want to eliminate us. This is no time to be under a pomegranate tree. Now this was the apathy army he had control of. And he had been enlisting the sissy soldiers. (Laughing) Now don't laugh. They would get up and they have worship and their song would be, their main theme song would be Tiptoe Through the Tulips. That's what they were. They were a bunch of Tiny Tims tiptoeing through the tulips. And that is the church today unfortunately. When we're supposed to be out to battle, when we're supposed to be battling the enemy, we're under some stinking pomegranate tree shaking in our boots. That's where the church is. The church is hiding. The Christians are hiding. We get letters from pastors. Do we have any spare paper around here? I like the sound

770

effects of it. Good. Give me another one. Yeah give me the whole tablet. (Laughing) I had a Baptist pastor write me a three-page letter and so I said you know I got my radio program, and said you know what I'm not even going to read this because this is what I think of it. (Rips paper) That's what I think of your stinking letter. Don't write me any more letters, because I could care less what you say. Now Brother Grant that's being rude I know, but guess what, you know why I ripped it up? Because I know in my heart he never wrote a three-page letter to the abortion doctor and said quit your abortions. He never wrote a three-page letter to some of these legislators that are pushing the homosexual agenda. He never wrote a letter to the ACLU saying quit defending the homosexuals. He never wrote a three-page letter to the enemy, but he wants to write a three-page letter and he wants to straighten us out while we're out there trying to stop this homosexual agenda from going forward. He that does a little five minute piece on a radio program, this particular pastor, and he reads history. He goes, oh yeah "And this day in 15 something and Martin Luther nailed his 95 Theses", and I wrote him a letter when we were going to do this Southern Decadence march. I said come and make history with us, it's a lot better than just reading history. You got two people out there. You got people that love history and love to read history. Hallelujah. And then you got people Hallelujah that rise up and say come and let us go and they make history. And you determine, tell me what you want to be this morning (clapping). But if you're looking for some Christians to go with you to the battle. Don't. Don't, initially, and hold on that word "initially". They ain't coming. They ain't coming. And I believe Jonathan was probably over there. And I can't, you know I'm just speculating here,

it's not in the Word, but I imagine Jonathan's over there saying to some of the soldiers, maybe even to his dad, "Come on, let's go get them. We can take them. Come on. Come on. I've been in prayer. As a matter of fact I was just on the phone with David and he said, 'yeah go get 'em' and then we got to finish our seminar." (Laughing) We're getting into several dispensations of you know whatever, some theological stuff. Dispensations. You know, here's the problem I have. I don't have problems with people studying deep the Word of God. It's that they don't apply it. They're hearers of the Word and not doers. But Jonathan was only trying to get them to go fight and I'm sure they're saying, "hey wait a minute, let us pray about it." Hallelujah. I don't feel that. So he's frustrated and he's saying, "Come now, come on armor bearer, let's go and let's go take 'em." So he goes. That's the first thing we have to do. We've got to get out of the boats. We've got to decide we're going to get out of the boat.

We're going to move. We're going to go. Even though no one goes with us. And we're going to go, and we're going to do something great for God. I say I went to Bible School, I have nothing against Bible Schools, but the Bible School I went to outside of Pittsburgh, Pennsylvania, had upon its walls in the sanctuary "Attempt great things for God" on this side, big you know poster, and on this side, "Expect great things from God". Attempt great things for God, expect great things from God. So you got to believe God and go out there and believe that he's going to use you and step out of the boat.

"Well Brother Grant no one will come. I put out a newsletter and no one will come." So what, go alone. You alone, my friend this morning, can make a difference. Verse 4, 1 Samuel 14:4 *And between the passages*

*by which Jonathan sought to go over unto the Philistine garrison, there was a sharp rock on one side, and a sharp rock on the other side."* What's your interpretation of that Brother Grant? Well, it's very simple. Whenever you go out to do something for God and you step out of the boat, there's this narrow passage you're initially going to have to go through, it happens to everyone, where you get it on both sides. (Laughing) You look over here and there's a sharp rock, and you look over here and there's a sharp rock. You got the homosexuals screaming at you on one side, and you got the dead apathetic church screaming at you on the other side. You got your critics over here. That's right. You're going to have to, I believe God allows it to test you, to toughen you up a little bit before you get out there with the real enemy. But let me tell you what. When you go to do something for God, you step out of the boat, you're going to have to go through that narrow place where there's a sharp rock on this side, and a sharp rock on that side, where you're going to get it from everyone. You're going to have your well-meaning Christian friends saying, "Brother I don't think that's God. You're going down to videotape an orgy in the street. Oh brother, you need to pray about that." And then you have your not so well-meaning friends telling you, "Brother I just want to tell you you're getting into flesh. You know you're too prideful, you're too arrogant, you're in the flesh." And then you have your critics, "You're not loving." So you're going to get it, but you're going to have to determine that I'm going to obey God. Look I believe in wise counseling, Christian counseling, but I'm telling you what. I narrowed it down to my wife (laughing). I just don't listen to my, I just don't listen to Christians anymore. They will try to talk you out of going and beating up the Philistine Army on your own. Go tell

773

them. "What you learned from the conference there. I learned that I can take this homosexual community on my own. I can do it by myself. (Laughing) Now wait a minute now. I told you not to go to that conference." (Laughing). But you're going to have to determine that you're going to hear from God and you're going to get through that narrow path. How are you going to do it? How are you going to do it? What do you listen to? Go to Verse 7 real quickly. *And his armor bearer turned to him, his armor bearer said unto him, "Jonathan do all that is in thy heart. Turn thee, behold I am with thee according to thy* heart." Very few Christians are going to tell you, "Do what's in your heart." If that's in your heart and it's not sin, probably God putting that there, and it may sound crazy and wild to us, but God can use it. So do what's in your heart. You won't hear that advice. Well in seminary, in the Evangelism 101 class what we've learned Brother Grant is if you do that then you're going to turn them off (Laughing) I don't listen to them anymore, those people. I don't listen to them ex-gay groups any longer. We went in, we went in a number of years ago to the, to the French Quarter during the gay pride weekend and they had a, there a, they had a dike march, the lesbians. That's what they called it, the dike march. So we announced it on the radio, we're going in there. I'm going to confront them. And praise the Lord, and so we got some of these "ex-gay groups" all excited. And so one of them got a hold of me on the phone and said, "Praise the Lord man, we want to go with you. What's going to be your approach?" I said we're just going to go in there and preach the Gospel, we're going to have some signs up, and then just go in there and deliver the Word of the Lord. "Oh praise the Lord. Can we go with you?" Yeah, yeah, yeah. "What are you going to put on the signs?" I said that's a good question you know

774

because I don't want to get in the flesh and put something like that would be offensive or something like that on a big sigm So I said what we're telling all our people is this just use scriptures. So we're going to go in there with signs like Jesus Said Repent or Parish. And she said, "Oh, you're going to turn them off Brother Grant. You got to go in there with love." That is love. That's the message of Jesus. As a matter of fact it was so loving he said it twice. (Laughing) He repeated it.

You got these people that are ashamed of the Gospel so don't listen to them. So who do you listen to? Listen to your heart. Whatever is in your heart. Do it. He's with you. It's not sin. That's the way I look at it. And the wilder, the better in my opinion. (Laughing) That's right. And he's not going to use orthodox, he's not going to use, see, all this, look, all this petition, you know, I was able to be on a national program with Dr. Larry Bates during this Ten Commandments stuff, and I was so fortunate and I didn't know what was going to happen. I tuned it in and trying to get the flavor of the program before, you know that I went on, and they had Jay Sekulow on there. And so Dr. Bates was taking Jay Sekulow to task on why wasn't he standing with Judge Roy Moore. Why was he saying he was disagreeing with him about his stuff. And so I'm listening to Jay Sekulow, and man I was so affected by him I was able to follow him. I said you know what, we're sick of the appeals. Jay Sekulow is like "We needed to appeal that, if he would have appealed that he probably would have had more credibility, blah, blah, blah." You know I'm sick of appealing all this stuff. Why do good people have to go to these stinking wicked judges and beg them to please do the right thing. No forget the appeals. Forget the petition. We've been petitioning for 20 years. Signing

petitions for 20 years, making phone calls for 20 years. We've been begging bad legislators and bad judges to try to do the good thing. Enough is enough. My friend. Just start taking it to the streets. It's not we're going to, it's God, we have to pray and ask God, "God gives us ways that are going to work. Give us techniques that will give us results." It may be taking a video camera and videotaping them, a sex orgy in the streets to expose the enemy. And then taking it to the media, and then having a rally or march and going right in there and saying, "You're not going to our streets, Sodom and Gomorrah, you filthy sinners." "Brother Grant, why don't you have a meeting with the mayor?" I don't want to meet with the mayor. I want the mayor to stand up and say enough of this stuff. End Southern Decadence. I don't want to meet with him. I don't want to have lunch with these guys. We had a pastor that came out from one of these seminaries to the rally and he's being supportive and he told his church, and he's being supportive of all this stuff, and I was so thankful. And oh it was amazing. But praise God. We're going to get some of these guys to come on board. But I'm preaching and I'm hitting the mayor. I'm hitting the City Council. Then I hit the police superintendent, Eddie Compass. Eddie Compass enforced the laws.. This guy walks off. I didn't know it at the time. I heard a lady. He walks off And so some of his members told me later why he walked off He was saying that he was displeased with everything and the way it went and he didn't support it because he would have lunch with the police superintendent and he was trying to win him over to the Lord. The friendship evangelism. And so while he's been having lunch with this guy and they've both been putting on weight and pounds, they've been having an orgy in our streets. When are they ever going to get

around and tell them to do something? Let me tell you what. When Moses went to Pharoah he didn't say, "Let's go to lunch. I want you to read a tract I wrote." (Laughing) When John the Baptist went to Herod he didn't say, "Look there's a nice diner down the street. Come on I'll buy you lunch. I'll be your friend. Jesus loves you." What are they learning in these stinking seminaries. And when you read through all the Old Testament, all the different ways God defeated the enemy, you know what, you can't find one place where he defeated the enemy the same way. It was always something different. He rained fire and brimstone on one, then he'd send this on another, and then he would do this on another, and he would have his people do this in another way. It's always different. So find out the different ways, find out what way God wants you to defeat the enemy. That's going to take fasting and prayer and laying on your face and interceding and trevailing in prayer. "Oh God, God, Lord speak to me. Lay something in my heart. I know there's ways that you can defeat this army and stop this but Lord you've got to show me. You've got to show me. Give me a bombshell, give me a bomb oh God. Give me something Lord that's going to shake the city, and shake the state, and shake this nation. Oh Lord I need to hear from you, Lord. Lord prepare us down here. Lay something on the heart. A mandate, a plan, a strategy, a tactic." Go videotape the orgy and give it to the media. And don't tell any of your Christian friends because they'll all try to discourage you. Right. Do what's in your heart. He's with you. Some of you right now. You have these wild, crazy things you won't even tell anybody about. You have this plan and you can't get away from it. The Lord put that there. The Lord put it there. Go do it. You want to start this, or you want to start that, or you want to go

777

![black redaction bar]

do this, and it's like you're a little shy and you're a little reluctant. It's like, what will people think? Don't. Don't care. That's the problem. Jay Sekulow was on that program and he goes, what did he say, he was saying, oh man, he said something about oh Lord, he said something along the lines of confrontation. Oh man, I'm going to think of it in a minute. But we got to stop worrying about what people think. I don't care what they think. And I wish I could, I'm going to think of that in a moment what he said, and I just took off on it. I just took off on it. About convenient, confrontation, something along those lines, and it's like we've been trying to placate this world and do it the world's way and it's not working. It's not working. God help us. God give us strategy. We need some people that will get up with radical ideas and go forward in the name of Jesus. Now listen what he says in Verse 6. *And Jonathan said unto the young man that bear his armor, come and let us go over unto the garrison of these uncircumsized. It may be that the Lord will work for us. For there is no restraint to the Lord to save by many or few.* I just thought of what Jay Sekulow about now I just forgot it again. He said again about confrontation. It would have been less confrontational. I think, yeah basically what he was saying, less confrontational. We've been trying to do things less confrontational. Of the whole () and that's what we've been trying to do and not offend people. And it's not working. You know we wrote our petitions, we've made the phone calls. Now it's time to go to the streets in the name of Jesus. And we got to understand this one thing. We don't need the big numbers initially. We don't need the big numbers initially. It's for, there is no restraint to the Lord to save by many or by few. And that's a problem that we have in Christiandom is that we think the big numbers are going to give us the

victories, and when we don't have them, what we start to do in our minds and start to reason and rationalize and say if I just compromise here, and if I just lay off the Catholicism here and if I just lay off here, and if I just lay off here, then these will come over and help us and our numbers will be bigger and we will have more strength and power. No, you'll be more deluded. Because you alone can make the difference. We were tempted to compromise with the Archdiocese. I took the Bishop a videotape a month earlier. I went right into his house. They invited me into the house. They invited me for lunch. I wouldn't stay of course, you know why. (Laughing) 1 Corinthians 5. A month earlier now we were out there with our group having signs that said "Thou shalt not have sex with little children." And he drove by and we waved. But apparently he didn't recognize me. When I went in there I gave him the tape. I just said "Here, the mayor's Catholic." They came out and took a strong stand. But we didn't have to beg them, we didn't invite them to the march. As a matter of fact they know our views. The newspaper wrote all about our calling the Catholic church satanic and demonic. Never said it wasn't. They asked us about it. Look, you go examine history. You go looj at the crusades. You go look at the inquisitions. You go look at the cover of the pedophile preacher. You determine for yourself We're not going to compromise it. But they came out anyway and said something. So we don't need to compromise our message because we have God. So it's not by many nor by few that the Lord is going to bring this victory. It's going to be you going forward with his blessing and his annointing. Don't make the mistake to try to get great numbers and then start compromising. Just go yourself initially. And then Verses 8–10 and for the sake of time I'm not going to go

779

read all of that, but just go to the latter part of Verse 10 where it says *and this shall be a sign unto us.* In other words, they're saying look, here's what we're going to do. We're going to go show ourselves and if the Philistine garrison says "Hey come on over" we'll know it's a sign to go and get 'em. Confirmation is good. Now I know I just said hey be radical, the wilder the better, whatever God has in your heart go to it. But get confirmation along the way. I'm always looking for confirmation from God along the way. So don't be spiritually reckless. Don't interpret what I'm saying to be just some spiritual, spiritually reckless. See confirmation along the way by what God has been putting in your heart. And he will. He wants to confirm that you're on the right track. Matter of fact now I just tell all my critics you know why God put us on Prime Time? You know why God sent us that message across the nation? You know why God gave us an eight minute national commercial that probably would have cost us millions and millions of dollars, that we got for absolutely free? It's because what we did was right. We did it God's way. And only God could have ever been in this thing the way he did. So all you critics, guess what? God did this. And God did this because our tactics and our strategy and the way we went about it was right. He confirmed it, and confirmed it, and confirmed it, and confirmed it, so don't be afraid of confirmation.

Now go to Verse 11, 12, go to Verse 12. *Then the minute the garrison answered Jonathan and his armor bearer and said come up to us for he will show you a thing and Jonathan said unto his armor bearer come up after me for the Lord hath delivered them into the hand of Israel.* What did he say? Come up after me for the Lord "hath" delivered them into the hand of Israel. He starts out

divinely frustrated. He manifests a fearlessness, and you have to be fearless in this battle. God's not giving us the spirit of fear, but the power of love and a sound mind. We cannot be afraid of the enemy. Although we understand their power, we don't underestimate them, we recognize their strengths, we don't fear them, but my friend you're not going anywhere unless you have some faith in God. Let me tell you what I did before we went into the Southern Decadence rally and march in 2000, just this last Southern Decadence. I preached for seven Sundays on faith. Seven Sundays I preached on faith until I was so filled with faith, we don't have mountains in Louisiana, but if we did, I would have said all the men to the mountains be thrown into the sea. I mean I tell you what we need to have so much faith in God, we need to understand that with God all things are possible. We had a brother that came into the church and he started to say, "Brother Grant you're never going to stop Southern Decadence" and before he even got it out of his mouth, I had my spiritual sword out, fooom, I took his head off, his spiritual head, and it was rolling down the aisle. Don't you tell me we can't stop Southern Decadence. Don't tell me we can't usher in revival. Don't tell me we can't turn this thing around. Don't tell me God can't restore righteousness in this nation. I don't want to hear it. You don't know my God. And don't go quote, don't let me ever hear you quote with God all things are possible, because you don't believe it if that's your attitude. My friends with God all things are possible. Brother Grant do you think we're going to have revival, a reformation, a third-grade awakening in America? I believe we can, and I believe we're going to. When the church stands up with faith, divinely frustrated, going forth in fearlessness, and starts to say to these mountains be thou removed and

781

thrown into the sea, believe what they say and they will have it. When they start to understand that with God before us, who can possibly be against us? Hallelujah. When we start being strong in faith and calling those things that are not as though they are, then God will move on our behalf. When we start going forward and saying God has delivered the enemy into our hands. All before the Southern Decadence thing, people were asking me how do you think it's going to go? How do you think it's going to go? Man, God is going to give us a victory. God is going to give us a victory. God is going to give us a victory. I don't know what you're reading in your Bible, but my Bible say he is able to do that which is exceeding abundantly, but Father we ask you to think according to the Power of the Holy Ghost that works in us. Exceeding abundantly above all. If he just said "All" it would have been great. If he would have just said "Above All" that would have been super duper. If he would have said "Abundantly Above All" that would have been wheeeeww!! But Paul said exceeding abundantly above all that we pray about, think about, dream about. I don't know what you read in your Bible, but my Bible says that by faith they subdued kingdoms, wrought righteousness, attained promises, stopped the mouths of lions, quenched the fiery darts of the wicked, and turned to fight the armies of the alien, women received their dead back to life again because they had faith in God. He goes forward in faith believing God, saying it, declaring the Lord hath delivered the enemy into our hands. Let's go and whip 'em. Us alone? Yes. You alone? Yes. 13 and 14 quickly. *And Jonathan climbed up on his hands and upon his feet and his armor bearer after him and they fell before Jonathan and his armor bearer, came after him.* And that first slaughter which Jonathan and his armor bearer made was about twenty men. Wheeeww!! Come

on. Let's go. God has delivered them all into our hands. Hallelujah! Boom, boom, boom, boom, boom. There's twenty. Whew. Ca-Ching. Yes. Glory. Glory to God. Let's go through the drive-thru at McDonald's and come back and get the rest. He had a willingness to fight. I'm going to tell you why pastors don't get out on the front line. Brother Ralph. Why pastors don't get out there on the front lines. Why they're not involved in fighting the abortion and homosexual issues and so forth. They don't have a willingness to fight. They don't want to fight. You got to have a willingness to fight. You got to have a willingness to fight. You got to want to get in there and scrap for God. I mean scrap with the devil for God. Just get in there and man, devil you're not going to do this to New Orleans. You're not going to do this to Louisiana. You're not going to do this to America. You know what my attitude was before I was saved, when I would get into a fight. You may whip me, but guess what? You're going to pay a price for it. You may knock me out, but I guarantee it man I'm going to take your eye out. I'm going to pull, bite your ear. In New York we had that. You just could do anything you want. Just scratch. People say, "You're a sissy for scratching." So what, I just dug your eye out. (Laughing) Call me a sissy all you want, you're going out with one eye. I mean I will do whatever I got to do to whip your behind, and you better kill me. You better kill me because I'll tell you what, five more minutes. That's what we got to have in this spiritual sense. Devil you can come, you can try to pass the homosexual marriage, and homosexual adoption, but I'll tell you what. You're going to be in for a fight. You can try to bring Southern Decadence in and have these homo-sexuals march up and down our streets and have an orgy in the street, but you're in for a fight. This was probably like the sermon for 4:00 rather than 8:30 in the morning,

783

but anyway. I only had my one cup of coffee Brother Grant, don't scream. What are you saying? I'm saying you alone can make a difference. Verse 20. Excuse me. Yeah, Verse 15 and 16. *And there was a trembling in the host in the field and among all the people the garrison, the spoilers, they also trembled and the earth quaked and so it was very great trembling.* They started to go forward to beat the enemy and I'm telling you the enemy's camp was thrown into chaos. Let me tell you what, it doesn't take a lot to throw the enemy camp into chaos. (Clapping). I'm telling you what. When we got that videotape and we took it to the media and the media's playing it, I mean the homosexual community in New Orleans, whew, they didn't know what to answer. First they say it's only a few isolated cases. Then you have others saying oh it goes on all the time. Then you say it goes on all the time, all year long. You understand it. Then they're handing out, matter of fact they interview me and they say, "Reverend Storms what do you think about the homosexual community handing out all these condoms with little things on it saying, 'Public Sex Equals Ten Days in Jail' and posters and all this because they don't want people going to jail." I said, "Well they're admitting they were having a lot of public sex otherwise it wouldn't have been a big thing." They're all in chaos. I'm telling you what. You have some, you dare to get out there, out of your boat and get annointed with the Holy Ghost and believe God to do something, you're going to throw their camp into chaos. There will be a confusion. Jonathan and his armor bearer are going for taking out 20 men, a little tiny victory, oh you know you just did a little thing. That's right. But what about all the rest. Somebody went on the Internet and typed in Southern Decadence and our name and we're on like 352 homosexual web pages because of one little thing we did in

New Orleans, the whole homosexual community is "You got a pastor down there videotaping, in the barrooms and everything." They're in chaos. Now here's the good part. Verse 21 And Saul and all the people that were with him assembled themselves and guess what, they came to the battle. See initially you got to start out alone, but once they start recognizing, we started out with 30 at a press conference, 150 at a rally, 400 at this last rally (), I believe next year we'll have thousands, because why, because we're going to, and you shouldn't have to do this but we're going to strengthen the weak and the timid and they're going to say, "hey you're winning that victory, huh?" "Well maybe we can come over and help now." (Laughing) Hell we done sue all the people, you know all the tough guys, you can go take the wimps now. But praise the Lord, they came to the battle. They came to the battle. Verse 21. Moreover the Hebrews that were with the Philistines, what were the Hebrews doing with the Philistines? They started to fight. You know what, they're backsliders we were down there preaching Bill Shanks. You know, how many know Bill Shanks? He's down there preaching during Southern Decadence and he recognizes () and it was down there and saw a male prostitute who had been in church for years and years. Hey you're a Hebrew. What are you doing in the Philistines' camp. And he began to weep and cry and boo hoo I hate my life. But Bill was man, let me pray with you. You need to get out of here. Come on man. Get back and serve God. He'll forgive you. He'll restore you. He's merciful. He's compassionate. The backsliders will come once they see you leading the way and charge him. At Verse 22, and likewise the men of Israel, I like this, that were hiding themselves in the caves. What are you doing in the caves? I'm reading my Bible. (Laughing) I'm quoting, memorizing scripture. Well think about apply-

ing the Word. Be a doer of the Word. But they look. What's all that noise out there? Who's that radical preacher marching with his broom down Bourbon Street. I had a broom. See and I have to ask people about that too. I said hey I'm going to take a broom. Moses had a staff. I'm going to take my broom, and I'm going to sweep up the French Quarter, the streets. What do you think about that? Oh Brother Grant that's not a good idea. You look goofy. After all the media put it on there, it was like the trademark of the whole thing. Oh that was a good idea, Brother Grant. Yeah now you said it. (Laughing) Right, now, now that was a good idea. Now, right. (Blah, blah, blah) that's why I don't listen to you guys. That's what I said. That's why I don't listen to you. I just, you know I pass things off and you tell me stuff and it goes in one ear and right out the other. I'm going to do what's in my heart. But all these people are coming out of the caves. They're hiding from the churches and their churches. Now they're coming out because you made a difference. Because you alone can make a difference. So the Lord save Israel. Good day. Good day. (Blah, blah, blab) 23 scriptures. Nice Bible Sunday School lesson, huh? But it's real. And the good news is that the same God that Jonathan served, we serve. And what God did for him, God can do for us. If we do what he did. God will do for us, what he did for him.